**WESTINGHOUSE ELECTRIC CORPORATION,**
Petitioner,

v.

**PENNSYLVANIA DEPARTMENT OF ENVIRONMENTAL PROTECTION,**
Respondent.

Commonwealth Court of Pennsylvania.

Argued Nov. 3, 1999.
Decided Feb. 10, 2000.

**1278**

Kenneth S. Komoroski, Pittsburgh, for petitioner.

Dennis A. Whitaker, Harrisburg, for respondent.

Before DOYLE, President Judge, and COLINS, J., SMITH, J., PELLEGRINI, J., FRIEDMAN, J., FLAHERTY, J., and LEADBETTER, J.

SMITH, Judge.

Westinghouse Electric Corporation (Westinghouse) petitions for review of the March 26, 1999 order of the Environmental Hearing Board (Board) on remand that assessed penalties and costs of investigation against Westinghouse for violations of The Clean Streams Law, Act of June 22, 1937, P.L. 1987, *as amended,* 35 P.S. §§ 691.1—691.1001, and of regulations of the Department of Environmental Protection (DEP) implementing The Clean Streams Law. Westinghouse questions whether the Board erred in assessing a multimillion-dollar civil penalty under The Clean Streams Law based principally upon its purported deterrent effect. Further, Westinghouse questions whether the penalty "reasonably fit" the violations where those violations were neither willful nor reckless, the violator has expended millions of dollars to remediate the contamination and the penalty assertedly far exceeded other Clean Streams Law penalties assessed for egregious and willful misconduct.

The history of this protracted litigation is detailed in *Westinghouse Electric Corp. v. Pennsylvania Department of Environmental Protection (Westinghouse I),* 705 A.2d 1349 (Pa.Cmwlth.), *appeal denied,* 556 Pa. 717, 729 A.2d 1133 (1998). A panel of this Court affirmed the adjudication of the Board which determined that Westinghouse had violated Sections 301,

307(a) and 401 of The Clean Streams Law, 35 P.S. §§ 691.301, 691.307(a) and 691.401, and regulations at 25 Pa.Code §§ 101.2(a), 101.2(b) and 101.3(a). The Court concluded, however, that part of the Board's penalty analysis was based upon the assumption that all illegal discharges proven resulted in contamination, although the Board had expressly declined to find that all discharges actually contaminated waters. As a result, the Court vacated the Board's $5,451,238 civil penalty and remanded for calculation of a new penalty based only upon matters that the Board had found to be proven.

To summarize briefly, from 1968 to 1989 Westinghouse manufactured elevators at a plant that it erected near Gettysburg, Pennsylvania. Trichloroethylene (Tri) and 1,1,1–trichloroethane (Ta) were used to degrease parts before painting or welding. On August 16, 1988, the then Department of Environmental Resources (DER) filed a complaint for civil penalties alleging that Westinghouse had unlawfully discharged Tri and Ta. After extensive hearings, the Board determined that Westinghouse had caused: numerous releases from leaking drums of spent degreaser in an old drum storage area outside the plant between 1971 and 1978; leaking of spent degreaser from scrap hoppers on to the railroad loading dock area then running to the soil outside several times a week between 1973 and 1978; at least one release from employees in the welding area pouring spent degreaser onto grass adjacent to the building; a one-time discharge of approximately 50 gallons of Tri and rainwater from a 275–gallon tank onto the ground behind the building; and release of wastewater containing Tri and Ta into a storm drain resulting from cleaning of floor grates from the painting booth.

The Board imposed penalties of $61,500 for violations of Sections 301, 307 and 401

of The Clean Streams Law, $2,677,384 for failure to notify DER and downstream users of releases under 25 Pa.Code § 101.2(a) and $2,677,384 for failure to prevent injury to downstream users by removing residual substances from the ground under 25 Pa.Code § 101.2(b) and failure to take measures to prevent polluting substances from directly or indirectly reaching the waters of the Commonwealth under 25 Pa.Code § 101.3(a). In addition, the Board imposed $35,015 as the cost of investigation, for the total civil penalty of $5,451,238. On remand, the Board assessed the same amounts for violations of The Clean Streams Law and costs and assessed a penalty of $1,600,000 for the violations of 25 Pa.Code § 101.2(a) and an equal amount for the violations of Sections 101.2(b) and 101.3(a) for a new total civil penalty of $3,296,515, or a reduction of $2,154,723.

Westinghouse acknowledges that the only issue before the Court on the current petition for review is the propriety of the two penalties of $1,600,000 each.[1] Westinghouse first asserts that the Board's "principal motivation" in assessing the penalty of $3,200,000 for violations of the regulations was deterrence. It quotes the Board's statements that it was concerned that the penalty be "large enough to deter other potential violators" and that it "provide industrial managers with a credible deterrent to failing to comply with the notice and remediation requirements" so as to "convince members of the industrial community that they cannot simply ignore the regulations or write off the resulting penalties as 'the cost of doing business.'" Board's Remand Adjudication at p. 21. In the Board's original adjudication, Westinghouse notes, it stated that there was "no basis for considering deterrence if we choose to apply it," *Westing-*

---

1. Westinghouse notes that the Court's review is limited to determining whether the Board's findings are supported by substantial evidence and whether constitutional violations or errors of law have were committed. *Westinghouse I.* A reviewing court may not substitute

its judgment for that of the Board, and the Court will uphold the Board's determination if the penalties reasonably fit the violations found. *Wilbar Realty, Inc. v. Department of Environmental Resources,* 663 A.2d 857 (Pa. Cmwlth.1995).

*house Electric Corp. v. Department of Environmental Protection,* 1988 E.H.B. 1144, 1289 (1996),[2] and no further evidence of deterrent effect was introduced.

Westinghouse refers to *Department of Environmental Resources v. Lawrence Coal Co.,* 1988 E.H.B. 561, where the Board declined to consider deterrence in fashioning a remedy despite the dramatic effect of acid mine drainage discharges on streams with delicate ecosystems because of the total absence of evidence on which to base a meaningful decision that would act as a deterrent to the violator involved. Westinghouse further asserts that there was no evidence that its conduct was likely to recur or to be committed by others or that unlawful releases of chlorinated solvents such as Tri or Ta are now such a problem as to justify such a harsh penalty for deterrent purposes. It notes that the Board did not characterize its conduct as willful or reckless, and it quotes the opinion of a treatise writer, whose texts are not of record, that it was not until 1981 or even later that the environmental hazards of chlorinated solvents were understood.

■ DEP has counter-stated the question involved as whether the civil penalty of $3,200,000 is a reasonable fit for the 4356 days during which Westinghouse breached its duty to notify the Department and nearby users of its more than 1000 toxic releases, as well as its failure to take remedial action, its failure to notify promptly resulting in long-term damage and serious health hazards, its hindrance

of DEP's investigation and its effort to remediate only when requested. In essence DEP responds to Westinghouse's deterrence arguments by pointing out that the number and duration of the violations are primarily responsible for the size of the penalty, which is only slightly over $350 for each day of violation.[3]

DEP notes that Section 605(a) of The Clean Streams Law, 35 P.S. § 691.605(a), provides that a civil penalty assessed for a violation of the act or any regulation "may be assessed whether or not the violation was wilful. The civil penalty so assessed shall not exceed ten thousand dollars ($10,000) per day for each violation." The Board stated: "Most importantly, the size [of the penalty] is the result of Westinghouse's multitudinous and protracted violations. The penalty breaks down to slightly in excess of $350 a day from September 11, 1971 to August 15, 1983, when Westinghouse's duty to notify ended, a total of 4,356 days." Board's Remand Adjudication at p. 22. The Board stated that the penalty would have been more than $350 per day had it been intended to be punitive.

The Court agrees that the Board's penalty calculation on remand was not improperly based upon implementing a policy of deterrence without a factual foundation. The Board's discussion of deterrence in its original adjudication stated simply that the Board was not sure whether the amount would act as a deterrent, although it hoped

---

2. The Board stated that DER had not specifically considered deterrence in its calculations of requested penalties, and it noted that the deterrent effect of a particular penalty is related to the size of the violator. In the absence of evidence of the financial health of Westinghouse, it said, the Board could not know if the substantial penalty would have a deterrent effect. However, the Board stated that it trusted that the penalty would send a message to potential polluters, and it hoped that it would induce those in management positions to pay greater heed to those in their employ who call for stricter attention to environmental matters. *Westinghouse Electric Corp. v. Department of Environmental Protection,* 1988 E.H.B. 1144, 1289 (1996).

3. In a reply brief Westinghouse emphasizes that DEP argued before the Board on remand that this Court's analysis was flawed and that the Board should retain the entire penalty that it assessed originally. Consideration of what DEP argued before the Board on remand does not affect this Court's analysis of DEP's arguments before the Court at this time. Nevertheless, the Court cautions DEP that in the absence of an appeal or other attempt to preserve a challenge to this Court's ruling, a litigant is not free to argue to an administrative agency, or to a trial court, on remand that the order and rationale of this Court should be ignored and disregarded.

that it would. Similarly, in *Lawrence Coal Co.* the Board stated that a penalty with an element of deterrence was appropriate but that in the absence of proof of net worth, amount saved by the unlawful conduct and so forth, the principle of deterrence would be reduced to a generalized approach of imposing more than a nominal penalty. However, because the penalty would be large in any event due to the nature and extent of the violations involved, deterrence would not be much of a factor.

■ Westinghouse next contends that the $3,200,000 penalty does not reasonably fit the violations. It notes that the Court has stated that a penalty would not reasonably fit a violation where it would "strike at one's conscience as being unreasonable...." *United States Steel Corp. v. Department of Environmental Resources,* 7 Pa.Cmwlth. 429, 443, 300 A.2d 508, 514 (1973). Westinghouse repeats its position that a multimillion-dollar penalty against it is excessive where there has been no evidence that its management knew of the contamination or attempted to conceal it. However, as DEP points out, the penalties imposed by the Board are linked to the number, seriousness and duration of the violations involved here.[4] The protracted failure to comply with duties to provide notice and to take remedial measures vastly increased the danger to nearby families. The Court rejects Westinghouse's unsupported assertion that a "seven-figure penalty" may not be imposed unless intentional or reckless conduct is proven. Here the penalty of $3,200,000 does reasonably fit the sheer scale and duration of the violations.

■ Westinghouse contends next that the penalty of $3,200,000 is excessive in view of the fact that Westinghouse already has had to expend millions of dollars in

remediation costs at the site. It asserts that the Board and this Court have correctly stated that remediation expenditures may not be used as an offset against otherwise-applicable penalties when deterrence is not considered, but it argues that such expenditures should be considered where a penalty is based upon deterrence. The Court explained in *Westinghouse I,* however, that 25 Pa.Code § 101.2(e) expressly states that compliance with the other requirements of Section 101.2, including remediation efforts under Section 101.2(b), "may not affect the civil or criminal liability to which the person or municipality may be subject...." Remediation costs that a violator would be required to expend in any event may not be used to offset penalties properly assessed.

Finally, Westinghouse asserts that the penalty is excessive when compared to others imposed under The Clean Streams Law. It notes the statement of this author in dissent in *American Auto Wash, Inc. v. Department of Environmental Protection,* 729 A.2d 175, 182 (Pa.Cmwlth.), *appeal denied,* —— Pa. ——, 743 A.2d 923 (1999), that the amount of penalties that DEP had assessed against other gasoline station operators for the same violation was "relevant to determining the reasonableness of the penalty in the instant case." Westinghouse asserts that in the Board's history only the penalty imposed in *Department of Environmental Resources v. Froehlke,* 1973 E.H.B. 118, approached that imposed here.

In *Froehlke* a contractor for the United States Army discharged 1.5 million gallons per day of industrial wastewater containing oil, phosphates, other toxic compounds and occasionally heavy metals into a tributary of the Lackawanna River from 1962 until 1973. The Board found that the conduct constituted malicious and deliberate

4. Although Westinghouse asserts that the overwhelming majority of the penalty is based upon violations from releases from scrap hoppers onto the loading dock area, the Board expressly reaffirmed its original finding that drums in the old drum storage area released Tri and Ta into the soil at least once a week between 1971 and 1978, for well over 300 releases, although authority to penalize did not come into effect until September 11, 1971.

disregard for the laws and for the health and welfare of citizens, but the penalty imposed was $1,677,000. In *Department of Environmental Resources v. Canada–Pa, Ltd.*, 1989 E.H.B. 319, the Board assessed Clean Streams Law penalties of $43,985 for 797 days of violations, and in *Department of Environmental Resources v. Koppers Co., Inc.*, 1977 E.H.B. 55, despite discharges of industrial wastes in the form of boiler blow-down from two sources for 358 days and 69 days, the Board imposed a penalty of $1,000.

As DEP notes, the penalties imposed in *Froehlke* were calculated on the basis of four violations covering periods of 796 or 871 days, not eleven years as Westinghouse implies. Further, those penalties were the maximum allowed by law. The Court agrees that comparison to *Froehlke* supports rather than undermines the reasonable fit of the penalties involved here. In *Canada–Pa, Ltd.*, the violations concerned erosion, sedimentation and stream encroachment by a logging concern, and the Board expressly found that the damage to the environment was moderate and was appropriately covered by a penalty of $5000. In *Koppers, Co., Inc.*, in the absence of proof of injury to the waters of the Commonwealth, the Board imposed only a "nominal" civil penalty of $1000. Because the Board did not err in establishing a $3,296,515 civil penalty against Westinghouse, its order is affirmed.

### *ORDER*

AND NOW, this 10th day of February, 2000, the order of the Environmental Hearing Board is affirmed.