**SUNOCO, INC. (R&M), Petitioner**

v.

**DEPARTMENT OF ENVIRONMENTAL PROTECTION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Nov. 2, 2004.

Decided Jan. 7, 2005.

Philip J. Katauskas and Amy M. Oshman, Philadelphia, for petitioner.

Douglas G. White, Norristown, for respondent.

BEFORE: PELLEGRINI, Judge, and FRIEDMAN, Judge, and JIULIANTE, Senior Judge.

OPINION BY Senior Judge JIULIANTE.

Sunoco, Inc. (R&M) (hereinafter "Sunoco") petitions for review of the April 12, 2004 order of the Environmental Hearing Board (EHB) that denied Sunoco's appeal from a $3,465,660 civil penalty assessed under Section 9.1 of the Air Pollution Control Act (APCA)[1] based upon Sunoco's failure to install Reasonably Available Control Technology (RACT) on a timely basis on Boilers 6 and 7 at its Marcus Hook Refinery in Delaware County. For the reasons that follow, we affirm.

Sunoco's Marcus Hook Refinery (the Facility) is located within the Philadelphia Consolidated Metropolitan Statistical Area, which has been classified as a severe ozone non-attainment area. The Facility is a major emitter of nitrogen oxide compounds (NOx), which are subject to the RACT control program.

## History of RACT Program

The RACT program, which has its origin in the 1990 amendments to the Clean Air Act,[2] is a statutory program designed to reduce ground level ozone by controlling emissions of two ozone precursors, NOx and volatile organic compounds (VOC). The States were required to submit their proposed RACT regulatory provisions to the Environmental Protection Agency (EPA) by November 1992 and to provide for implementation of the required measures by May 31, 1995.

The Department of Environmental Protection (Department) published its proposed RACT regulations in August 1992 and ultimately promulgated its revised RACT regulations in January 1994.[3] The Department's RACT program is focused on technology rather than emission limits. Under the program, a RACT determination is made for the use of a specific control technology for each individual affected source.

The Department's RACT regulations require the operator of an affected facility to identify the sources to which the regulations apply and to ascertain through emission testing the total potential to emit and the actual emissions of NOx and VOC for the 1990 calendar year for each source at the facility. In other words, a baseline emission rate for both potential and actual emissions must be established for each source.

By July 15, 1994, each operator of a major NOx or VOC emitting facility was required to submit a written proposal to the Department designating the operator's preferred RACT for each affected source in the facility based upon a technical and economical analysis set forth in the regulations. Each RACT proposal was required to contain proper supporting documentation, a proposed schedule for implementing the RACT for each source, proposed testing procedures and an application for a plan approval and an operating permit.

The Department reviewed each RACT proposal and either approved, denied or modified the RACT selected for each source by the operator. After an operator received the Department's determination of the appropriate RACT for each source,

1.  Act of January 8, 1960, P.L. (1959) 2119, *as amended*, added by the Act of October 26, 1972, P.L. 989, 35 P.S. § 4009.1.

2.  *See* 42 U.S.C. §§ 7401–7671(q).

3.  *See* 25 Pa.Code §§ 129.91–129.95.

the operator was required to install the RACT.

### Sunoco's RACT Compliance History

In the present case, Sunoco operates two industrial boilers at the Facility, *i.e.,* Boiler 6 and Boiler 7, which are the focus of the penalty assessment. Both boilers are NOx sources. In January 1994, Sunoco hired two consultants, an environmental firm and an engineering firm, to prepare a RACT proposal for the Facility. In July 1994, Sunoco's environmental consultant submitted Sunoco's initial RACT proposal. Sunoco's RACT proposal was given high priority by the Department.

Sunoco's 1994 RACT proposal listed eight potential control options, which included the installation of ultra-low NOx burners (ULNB) and low NOx burners (LNB) on Boilers 6 and 7. Sunoco's preferred NOx RACT on Boilers 6 and 7 was combustion tuning, which involves only adjustments and upgrades to the current combustion system. Combustion tuning, however, was the least effective RACT for the two boilers.

Sunoco's July 1994 RACT proposal indicated a "control efficiency" for ULNB (reduction of NOx emissions) on Boiler 6 of 75% when the boiler was burning fuel gas, and 14% when burning fuel oil. For Boiler 7, which burned only fuel gas, the control efficiency was estimated at 75%.[4] Sunoco's 1994 proposal also indicated that the cost for installing ULNB on Boilers 6 and 7 would be $1,550,554 for each boiler.

The Department determined that as a guideline, the appropriate RACT to be implemented for each source would be the control option that obtained the greatest control efficiency while not exceeding a cost effectiveness ratio of $1,500 per ton.

Sunoco was aware at all times relevant to its 1994 RACT proposal that the Department had adopted the $1,500 guideline threshold for the RACT cost effectiveness ratio.

Although Sunoco's July 1994 proposal calculated the ULNB control option at $1,516 per ton, the Department corrected an error in the calculation that resulted in a cost effectiveness ratio well below the $1,500 per ton guideline. Sunoco subsequently submitted a revised September 1994 RACT proposal indicating a ULNB cost effectiveness ratio of $1,202 per ton for Boiler 6 and $810 per ton for Boiler 7.

Nevertheless, Sunoco indicated in its September 1994 proposal that its first choice would be to install LNB as the control option on both boilers. The cost effectiveness ratio for LNB on Boiler 6 was $1,183 per ton on Boiler 6 and $815 per ton on Boiler 7. The control efficiency for LNB on both boilers was 50% (compared to 75% for ULNB).

Sunoco's proposal was reviewed by George Monasky, an air pollution engineer for the Department. Monasky determined that ULNB should be installed on both boilers. On June 8, 1995, the Department issued Sunoco a final plan approval and compliance permit (1995 Plan Approval and Permit). The 1995 Plan Approval and Permit required Sunoco to install six ULNB on Boiler 6 and four ULNB on Boiler 7. That approval and permit also required installation by May 31, 1996. Sunoco did not appeal from the 1995 Plan Approval and Permit.

Sunoco, nonetheless, failed to comply with the 1995 Plan Approval and Permit. On July 12, 1995, Sunoco submitted a re-

---

4. In contrast, combustion tuning would only achieve an approximate 25% control efficiency.

vised RACT analysis which stated that Sunoco was withdrawing its application for ULNB. Monasky, however, did not find Sunoco's analysis to be reasonable. In April 1996, Sunoco performed another RACT analysis which indicated a cost of between $800,000 and $900,000 for both boilers with a control efficiency of only 36%.

In May 1996, Sunoco became aware of a control technology known as "spud burners."[5] Sunoco proffered the spud burner technology to the Department as an alternative to ULNB. In late May 1996, Sunoco submitted a revised RACT analysis proposing the installation of spud burners on Boiler 7. Sunoco submitted a plan approval application for the spud burners, but did not include any supporting documents.

In any event, Sunoco had done nothing to comply with the 1995 Plan Approval and Permit, which expired in November 1996. The Department did not extend or reissue the 1995 Plan Approval. In May 1997, Monasky re-evaluated all the data submitted by Sunoco and reaffirmed that ULNB met the RACT criteria for the two boilers and should be installed.

On September 11, 1997, the Department issued a notice of violation (NOV) to Sunoco for failing to comply with the 1995 Plan Approval and Permit. The 1997 NOV directed Sunoco to submit a detailed abatement plan explaining how it would correct the violations. On October 1, 1997, Sunoco formally responded to the NOV, but did not provide any information on how it planned to correct the violations.

In addition, Sunoco continued to file applications for a revised RACT determination. Several of these applications were found to be technically deficient by the Department. On September 11, 1998, the Department denied Sunoco's application for a revision of the 1995 Plan Approval and Permit.

Also, on September 11, 1998, the Department issued an Air Pollution Abatement Order (Abatement Order) which recited Sunoco's poor compliance history and noted that Sunoco had continued to operate the two boilers without either installing either the RACT or the required monitoring equipment. Sunoco appealed the Abatement Order to the EHB.

In October 1998, the Department inspected the facility and found that Sunoco had installed the spud burners on Boiler 7 without any approval from the Department with the risk that it might be ordered to remove them. The Department, however, did not order that the spud burners be removed.

In February 1999, Sunoco met with the Department and the parties agreed that the Department would allow Sunoco to submit a plan approval for the spud burners on Boiler 7 if those burners would achieve the NOx emission limit of 0.25 lb/MMBTU (pounds per million British thermal units) contained in the 1995 Permit. In April 1999, Sunoco submitted an emission test report that indicated that the spud burners had achieved this limit.

In July 2000, Sunoco submitted a plan approval application to install LNB on Boiler 6 and to burn only fuel gas rather than fuel oil. In November 2000, Sunoco submitted an application for the spud burners on Boiler 7. On August 2, 2001, the Department issued Sunoco a plan approval and revised compliance permit (2001 Plan Approval and Permit) for (1) the installation of LNB on Boiler 6, cou-

5. This control technology apparently involves the installation of pipe burners, which are sometimes referred to as "spuds."

pled with a restriction that it only burn fuel gas; and (2) the installation of spud burners on Boiler 7 with the imposition of a firing limit of 245 MMBTU per hour.

In August 2001 the parties also entered into a settlement agreement pursuant to which Sunoco withdrew its appeals of its application denial and the Abatement Order. In October 2001, Sunoco installed the LNB on Boiler 6.

On September 27, 2002, the Department issued Sunoco a civil penalty assessment which recited Sunoco's compliance history and determined that Sunoco's operation of Boiler 6 from June 1995 through September 2001 without implementing the RACT specified in the 1995 Plan Approval constituted violations of the RACT regulations and the APCA. The Department also determined that Sunoco's operation of Boiler 7 from June 1995 through October 15, 1998 without installing the RACT specified in the 1995 Plan Approval and Permit also violated the RACT regulations and the APCA. As a result, the Department assessed a total penalty of $3,465,660.

In its appeal to the EHB, Sunoco did not contest the Department's determination that it violated the RACT regulations or the APCA. Rather, Sunoco challenged the methodology used to calculate the penalty and the reasonableness of the amount. The EHB held a *de novo* hearing at which both sides presented evidence. In addition, Sunoco stipulated as to its liability for the violations underlying the civil penalty assessment.

### The EHB's Decision

On April 12, 2004, the EHB issued a comprehensive decision wherein it concluded as a matter of law that based on the evidence presented, the Department's assessment of the $3,465,660 penalty was a proper application of the APCA and was reasonable and appropriate under the cir-

cumstances of the case. Before addressing the merits of Sunoco's appeal to this Court, we will summarize the evidence relied upon by the EHB in reaching its decision.

Brian Trowbridge, an air quality program specialist in the Department's Division of Air Resources Management, was responsible for calculating the penalty and submitting it for approval to the Department's Air Quality Program Manager for the Southeast Regional Office. Trowbridge reviewed Sunoco's compliance history and RACT applications, and consulted with the Department's various personnel involved with this matter.

In assessing the civil penalty, Trowbridge considered the relevant factors contained in Section 9.1(a) of the APCA, which provides:

In addition to proceeding under any other remedy available at law or in equity for a violation of a provision of this act or any rule or regulation promulgated under this act or any order, plan approval or permit issued pursuant to this act, the [D]epartment may assess a civil penalty for the violation. The penalty may be assessed whether or not the violation was willful. . . . *In determining the amount of the penalty, the [D]epartment shall consider the wilfulness of the violation; damage to air*, soil, water or other natural resources of the Commonwealth or their uses; *financial benefit to the person in consequence of the violation;* deterrence of future violations; cost to the [D]epartment, the size of the source or facility; *the compliance history of the source; the severity and duration of the violation; the degree of cooperation in resolving the violation; the speed with which compliance is ultimately achieved;* whether the violation was voluntarily reported; other factors unique to the owners or operator of the

source or facility; *and other relevant factors.*

35 P.S. § 4009.1(a) (emphasis added).

Trowbridge also followed a Department guidance policy entitled *Guidance for Application of Regional Civil Assessment Procedure,* Doc. No. 273–4130–003 (Guidance Policy). The Guidance Policy contains procedures for calculating penalties for APCA violations and uses criteria similar to those found in Section 4009.1(a) of the APCA.

Trowbridge testified that the total penalty is comprised of two main components. The first component is the gravity component, which includes the statutory factors of damage to the environment, willfulness, severity and duration of the violations, compliance history and degree of cooperation. The second component is the economic benefit Sunoco received from its violations.

With regard to the base penalty, Trowbridge testified that he generally followed the recommendations of the Guidance Policy. Robert Kulp, the Department's Chief of the Division of Compliance and Enforcement, testified that he has been with the Department or its predecessors since 1970 and that he assisted in drafting the Guidance Policy. In fact, Kulp is the sole author of the RACT penalty provisions in the Guidance Policy.

For RACT violations, the Guidance Policy applies an annual emission limit such as that included in the permit and calculates a "base penalty" by determining the actual quantity of pollutant over the allowable limit (tons over allowable) that was emitted by the violating source. A dollar amount is then assigned to each ton over the allowable limit.

The dollar amount is also affected by two other factors, *i.e.,* willfulness and the severity of the violation. The dollar amount is also affected by the geographic area in which the violations occurred. The penalty per ton over allowable is higher in severe non-attainment areas.

Kulp further testified that because the RACT program is operated on a case-by-case basis and that a wide range of control options with different control efficiencies are permitted on an individual case basis, the Guidance Policy recommends dividing the amount of actual emissions by one-half (50% reduction figure) to determine the per-ton over allowable calculation for purposes of determining the base penalty for RACT violations in order to achieve consistency.[6] Kulp stated that there are more than 500 RACT facilities in the Commonwealth.

### Base Penalties for Boilers 6 and 7

In applying the Guidance Policy to Boiler 6 in the present case, Trowbridge first determined the period of noncompliance. Trowbridge determined that June 1, 1996 should be the start date because the 1995 Plan Approval and Permit required that ULNB be installed on Boiler 6 by May 31, 1996. Trowbridge determined the end date of the penalty period to be September 30, 2001. Trowbridge then gave Sunoco three months credit because the Department issued the 2001 Plan Approval and Permit for both boilers at the same time. As a result, the penalty period for Boiler 6 ran from June 1, 1996 through June 30, 2001.

Trowbridge then determined the quantity of NOx emitted by Boiler 6 during that period, with adjustments for the half-years

---

**6.** Otherwise, the incentive for RACT source facilities would be to install the least effective control option in order to be permitted to emit a greater amount of NOx, which would result in a lower tons over allowable calculation and, therefore, a lesser penalty.

in 1996 and 2001. These amounts were: 1996 half-year (182 tons), 1997 (373 tons), 1998 (370 tons), 1999 (329 tons), 2000 (357 tons) and 2001 half-year (111 tons). Trowbridge then used the 50% reduction figure for determining tons over allowable emissions contained in the Guidance Policy to arrive at the following tons over allowable amounts: 1996 half-year (91 tons), 1997 (186.5 tons), 1998 (185 tons), 1999 (164.5 tons), 2000 (178.5 tons) and 2001 half-year (55.5 tons).

Under Section V of the Guidance Policy, a penalty of $800 per ton is recommended for the first 25 tons over allowable if the violation is *willful,* persists for more than a year and occurs within a severe NOx non-attainment area. *See* Guidance Policy at 13; R.R. 888a. The Guidance Policy increases the penalty to $1,600 per ton for emissions in excess of 25 tons per allowable under those same circumstances. *Id.*

Trowbridge used the above-recommended amounts in establishing the base penalty for Boiler 6 as: 1996 half-year ($125,600), 1997 ($278,400), 1998 ($276,000), 1999 ($243,200), 2000 ($265,600) and 2001 half-year ($68,800). In accord with Section IX of the Guidance Policy, these yearly base penalty amounts were also adjusted to account for two other factors listed in Section 9.1 of the APCA: *degree of cooperation* by Sunoco in resolving the violations and the duration of the violation, *i.e.,* the overall *compliance history* of the source. *See* Guidance Policy at 21; R.R. 896a.

Regarding the *degree of cooperation,* Trowbridge determined that Sunoco had not been cooperative and increased the base penalty 10% for each of the annual or semi-annual periods. Regarding *compliance history, i.e.,* the duration and persistence of the violations, Trowbridge increased the base penalty as follows: 1996 half-year (0%), 1997(10%), 1998(20%), 1999(30%) and 2001 half-year (30%). As a result, the total base penalty amount for Boiler 6 was $1,639,680. *See* Hearing Exhibit C–22 (Boiler 6 Penalty Calculations); R.R. 1276a.

Trowbridge essentially employed the same method of calculations for determining the base penalty for Boiler 7. The penalty period for Boiler 7 ran from June 1, 1996, the day after ULNB was required to be installed on Boiler 7, through September 30, 1998. Trowbridge again assigned a penalty of $800 per ton for the first 25 tons over allowable and $1,600 per ton for emissions exceeding 25 tons over allowable. Trowbridge then upwardly adjusted the base penalty 10% for 1997 and 20% for 1998. The total base penalty for Boiler 7 is $434,720. *See Id.* (Boiler 7 Penalty Calculations); R.R. 1277a.

### Economic Benefit Component

James Bixby, a financial investigator for the Department, was responsible for calculating the financial benefit Sunoco obtained by its noncompliance with the 1995 Plan Approval and Permit. Both parties stipulated to Bixby's qualifications as an expert in the field of economic benefit of noncompliance and in the use of the EPA's BEN model.[7] Bixby used the BEN model to

---

7. As the EHB noted, Bixby is a licensed Certified Public Accountant, has extensive private-sector experience as an accountant and has worked as a corporate tax auditor in the Auditor General's Office. Bixby has received substantial training in economic benefit analysis, including training in the use of the EPA's BEN computer model, which is designed to determine the economic benefit of noncompli-

ance with environmental laws and regulations. Bixby has also testified numerous times as an expert in financial analysis. The September 1999 BEN User's Manual, which was introduced into evidence as Exhibit C–27, is set forth in the record at R.R. 1058a–1113a. The EHB noted that the BEN model is designed to determine the financial gains a vio-

calculate the economic benefit Sunoco received from its failure to comply with the 1995 Approval and Permit by failing to install ULNB on Boilers 6 and 7 and its delay in ultimately achieving compliance by installing spud burners on Boiler 7 in 1998 and installing LNB on Boiler 6 in 2001.

Specifically, Bixby used the estimate of what it would have cost to timely install ULNB as required by the 1995 Plan Approval, which Sunoco estimated in its 1994 proposal as $1,550,554. This amount reflects the capital investment Sunoco would have made to install ULNB if it had complied in a timely manner. To determine the cost to Sunoco of its 2001 compliance, Bixby used the estimate of the cost to install LNB on Boiler 6 as indicated by Sunoco's July 2000 RACT proposal, which was $500,000. Using the BEN model, Bixby opined that Sunoco obtained an economic benefit of $1,391,260 as a result of its noncompliance with the 1995 Plan Approval and Permit.

Bixby performed a similar analysis for Boiler 7 using the $1,550,554 it would have cost to install ULNB on Boiler 7 in 1995 and the $231,333 it cost to install spud burners on Boiler 7 in 1998. Again, using the BEN model, Bixby determined that Sunoco received an economic benefit of $1,540,927 as a result of its noncompliance with the 1995 Plan Approval and Permit.

The EHB found Bixby to be a credible expert and accepted his determination of the economic benefit Sunoco received from its avoidance of compliance. The EHB noted that Bixby's testimony was supported by the relevant facts of the case.

Adding Bixby's economic benefit calculation for Boiler 6 of $1,391,260 to Boiler 6's base penalty of $1,629,680, Trowbridge calculated the total penalty for Boiler 6 to be $3,030,940. Trowbridge, however, did not add an economic component to the base penalty for Boiler 7. As a result, the total penalty for Boiler 7 was $434,720. Consequently, the total civil penalty for both boilers amounted to $3,465,660.

In opposition to the evidence presented by Bixby, Sunoco presented expert testimony from Darren J. Tapp, an accountant employed by Price Waterhouse; Tapp has extensive experience in the assessment of economic benefit from noncompliance. Tapp also used the BEN model. The EHB, however, rejected Tapp's testimony as not credible because he testified that his analysis was based on flawed factual assumptions. Tapp testified that he was uncertain as to what Sunoco was required to install as RACT on the boilers in 1996 and that he did not have any knowledge of the 1995 Plan Approval and Permit. Tapp also conceded that his report was based on the mistaken understanding that the RACT equipment Sunoco finally installed was the same type of equipment that it would have installed in 1996 if it would have timely complied.

With regard to the merits of Sunoco's appeal, the EHB rejected Sunoco's various assignments of error and concluded as a matter of law that the Department's penalty assessment was a proper application of the APCA and was reasonable and appropriate in view of the circumstances of this case. Sunoco's petition for review to this Court followed.[8]

lator accrues by delaying or avoiding expenditures on pollution control.

8. Our review is limited to a determination of whether the EHB's necessary findings of fact are supported by substantial evidence, wheth-

er Sunoco's constitutional rights were violated or whether the EHB erred as a matter of law. *Westinghouse Elec. Corp. v. Department of Environmental Protection,* 745 A.2d 1277 (Pa.Cmwlth.2000). This Court will not substitute its judgment for that of the EHB, and we

**Merits of Sunoco's Appeal**

**I.**

■ Sunoco's first argument is that the EHB erred in upholding the penalty as reasonable where the 50% reduction figure specified in the Guidance Policy for determining the tons over allowable emissions calculation was admitted by the Department to be arbitrary. Section IX of the Guidance Policy provides that for purposes of penalty calculations for excess emissions, a 50% emission reduction should be used to determine the tons over allowable emissions calculation in order to "level the playing field." *See* Guidance Policy at 21; R.R. 896a.

The primary thrust of Sunoco's argument is that the use of the 50% emission reduction figure in determining the tons over allowable emissions calculation is arbitrary and bears no relation to the amount of actual emissions that exceeded the limits in the 1995 Permit. In support of its position, Sunoco cites Kulp's testimony that the 50% reduction figure bears no relationship to actual emission exceedance of a permit.

Sunoco further contends that Section 9.1(a) of the APCA, 35 P.S. § 4009.1(a), requires a determination of actual "damage to the air" and that the only reasonable and accurate way to determine harm to the environment is to measure actual emissions over *permitted* emissions. Sunoco asserts that the permitted emissions were the same in both the 1995 and 2001 permits, *i.e.,* 0.25 lbs/MMBTU. Sunoco further asserts that the base penalty is $1,586,176 higher than it would be if the calculation was based on actual emission exceedances over permit limits.

Sunoco also claims that every other section in the Guidance Policy that deals with emissions-based penalties for exceedances measures actual emissions over an established standard or permit. Sunoco further claims that other eastern States, including New York, New Jersey and Maine, have policies which determine harm to the environment by calculating actual emissions over a regulatory standard rather than using an arbitrary reduction figure. Therefore, Sunoco argues that inasmuch as the 50% reduction figure has nothing to do with actual permit exceedances, the Department's penalty must be considered unreasonable.

In response, the Department claims that during Sunoco's five and a half years of noncompliance, it emitted 2,238 tons of NOx into a severe non-attainment area for ozone, which was 1,283 tons more than Sunoco would have emitted if it had complied with the 1995 Permit. With regard to the 50% emission reduction figure in the Guidance Policy, the Department contends that the EHB did not err in upholding the use of the 50% reduction figure in that it is the best method to calculate excess emissions for RACT penalties.

■ As the Department points out, the EHB found Kulp to be a credible witness and accepted his explanation of the development and theory behind the Department's selection of the 50% reduction figure. It is within the sole province of the EHB, as fact finder, to make all determinations regarding matters of credibility and evidentiary weight. *Birdsboro and Birdsboro Mun. Auth. v. Department of Environmental Protection,* 795 A.2d 444 (Pa.Cmwlth.2002). Further, this Court does not "accept invitations to reevaluate

will not disturb the EHB's determination if the Department's penalty *reasonably fits* Sunoco's violations. *Id.* A penalty would not reasonably fit the violations found if said penalty would strike at the conscience of the Court as being unreasonable. *F.R. & S., Inc. v. Department of Environmental Protection,* 761 A.2d 634 (Pa.Cmwlth.2000).

evidence and credibility determinations." *Id.* at 447. "Additionally, the EHB need not provide specific reasons for finding one witness credible over another." *Id.* at 447–448.

Our review of Kulp's testimony indicates that it provides substantial evidence for the EHB's determination that the 50% reduction figure for determining the tons over allowable emissions calculation is a proper figure given all the considerations and goals of the RACT program. Section IX of the Guidance Policy provides in part that "[d]evelopment of RACT guidance relative to enforcement should serve to minimize the impact on staff time; *assure statewide consistency;* and *provide advance notice to the regulated community of their potential obligations.*" Guidance Policy at 20; R.R. 895a (emphasis added). As Kulp testified, there are 522 different RACT sources in the Commonwealth and that the 50% reduction figure would accomplish the goals of (1) leveling the playing field among all RACT sources, (2) not providing a disincentive to companies to propose and install better RACT controls and (3), not unduly penalizing companies for having proposed better RACT equipment.

In addition, the 50% reduction figure would not encourage an operator of an NOx source to install a less effective control technology (for example, a control option with a 35–40% control efficiency) in order to obtain a higher permitted amount of allowable emissions. Likewise, the 50% reduction figure would not discourage an operator of a NOx source from installing a more effective control technology (for example, a control option with a 75% control efficiency) for fear of being permitted a much lower amount of allowable emissions.

Hence, although other states may calculate RACT penalties differently from the Department, we agree with the EHB that the 50% reduction figure is reasonably tailored to (1) assure statewide consistency in RACT enforcement actions, (2) to provide the regulated community with advance notice of its potential liability for failing to timely install RACT and (3), to avoid penalizing companies which select RACT with higher control efficiencies. *See* EHB's Decision at 31, 47. Further, the 50% reduction figure will not serve to encourage an operator of a NOx source to install a less effective control technology in order to obtain a permit with higher permitted level of emissions.

In light of the above, we conclude that the Department's use of the 50% reduction figure specified in Section IX of the Guidance Policy for determining the tons over allowable emissions calculation was neither arbitrary nor unreasonable and, therefore, that the EHB did not err or abuse its discretion in upholding it. Moreover, it is well settled that "agencies are entitled to deference in interpreting the statutes that they enforce and that where a scheme is technically complex ... a reviewing court must put aside its discretion [in favor of the] expertise of the administrative agency." *Shawnee Dev., Inc. v. Commonwealth,* 799 A.2d 882, 889 (Pa. Cmwlth.2002), *aff'd,* 572 Pa. 665, 819 A.2d 528 (2003). As a result, although Sunoco essentially requests that we reweigh the evidence, we will not substitute our judgment for that of the EHB.

**II.**

Sunoco's second argument is that the EHB erred in upholding the penalty where the Department calculated the economic benefit component for Boiler 6 based on an estimated cost for technology that Sunoco never installed. Although Sunoco recognizes that Section 9.1(a) of the APCA, 35 P.S. § 4009.1(a), requires that the Department consider the financial ben-

efit to the person resulting from noncompliance, Sunoco asserts that the proper method for determining economic benefit is to base the economic benefit calculation on the *least costly* method of compliance.

As discussed above, however, Bixby calculated Sunoco's economic benefit using Sunoco's own 1994 estimate of what it would have cost to install ULNB on Boiler 6 [9] as required by the 1995 Approval and Permit, *i.e.,* $1,550,554. This figure was twice supplied by Sunoco in its 1994 RACT application as what it would have cost for it to timely install the ULNB. The Department asserts that this calculation used the least costly method because it was the *only* cost figure in the record for the only method of compliance possible.

Sunoco, to the contrary, contends that Tapp's BEN Model analysis was correct because its on-time capital costs were based on Sunoco's actual costs of compliance for Boiler 6 in 2001. Sunoco asserts that its actual project costs for Boiler 6 in 2001 were $383,305 plus $57,496 in engineering costs. Adding in other factors, Tapp's calculation indicated an economic benefit to Sunoco of $521,704. This amount is $869,546 less than Bixby's figure of $1,391,250.

In short, Sunoco argues that the least costly method of compliance should have been based on Sunoco's actual cost of compliance. In support of its position, Sunoco cites the Third Circuit Court of Appeals' decision in *United States v. Allegheny Ludlum Corp.*, 366 F.3d 164 (3rd Cir. 2004), where the Allegheny Ludlum Corporation (ALC) challenged the district court's calculation of a civil penalty under Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d). In *Allegheny Ludlum,* the Third Circuit held "that economic ben-

efit analysis should be based on the least costly method of compliance." 366 F.3d at 185.

As noted above, however, the Department contends that its calculation was in fact based on the least costly method of compliance. In *Allegheny Ludlum,* ALC challenged the solutions proposed by the EPA on the ground that they were considerably overpriced and also on the ground that ALC had already fixed the problems for much less money. To reiterate, the Department's cost estimate for timely installing ULNB on Boiler 6 was provided by Sunoco in its 1994 plan approval application. This figure was relied on the Department in making its 1995 RACT determination.

In addition, the Department points out that the BEN Model User's Manual recommends that where the violator obtained a cost estimate as of the noncompliance date, that figure should be used even if the violator had to spend a lesser amount to come into compliance at a later date. *See* BEN Model User's Manual at 3–21; R.R. 1093a. This reflects the fact that if the violator had complied on time, its capital investment cost would have been higher. *Id.* at 3–22; R.R. 1094a.

Furthermore, as the EHB noted, Tapp testified that he was unaware of what exactly was LNB versus ULNB control technology and that he was also unaware that the 1995 Plan Approval and Permit required ULNB on both boilers. As discussed above, matters of credibility and evidentiary weight are within the exclusive province of the EHB. *Birdsboro.*

In view of the foregoing, we conclude that the EHB did not err in accepting

---

9. Inasmuch as the Department did not assess an economic benefit component for Boiler 7, we will limit our review of the Department's economic component calculation to the calculation for Boiler 6.

Bixby's testimony as more credible in fact and persuasive as a matter of law than that of Tapp, Sunoco's expert. Therefore, we further conclude that the EHB did not err in determining that the Department's economic component assessment was reasonable and appropriate.

## III.

■ Sunoco's third argument is that the EHB erred in upholding as reasonable the Department's use of the $800/$1,600 per-ton over allowable figures for first-year excess NOx emissions in that it is contrary to the $200 per-ton over allowable figure mandated in the Guidance Policy for the year of June 1, 1996 through May 31, 1997. In support of its position, Sunoco cites to Section IX of the Guidance Policy (relating to RACT enforcement for the period of June 1, 1996 through May 31, 1997), which provides in part: "The RACT regulations are new to the regulated community and represent a mixture of technologies and operating requirements. *Therefore it is appropriate to utilize the minimal penalty in Section V ($200 per ton in excess of the allowable) for the period of June 1, 1996 thru May 31, 1997.*" Guidance Policy at 20; R.R. 895a (emphasis added).

In the present case, the Department imposed a penalty of $800 per ton for the first 25 tons and $1,600 per ton for emissions in excess of 25 tons for the entire period of Sunoco's noncompliance, including the first year, which ran from June 1, 1996 through May 31, 1997. Kulp, who authored the section of the Guidance Policy dealing with RACT violations, testified

that he was contacted by the Department's regional office regarding the appropriate penalty that should be imposed in the present case. *See* N.T. 06/17/03, 332; R.R. 328a. Kulp testified that he concurred in use of the $800 per ton over allowable figure because Sunoco's facility is located in a severe non-attainment area. *Id.* Kulp further testified that he did not take the severe non-attainment factor into account when he drafted Section IX and that he did not consider using the $800 per ton figure to be a deviation from the policy. *Id.* 332–333; R.R. 328a.

Our review of Section V of the Guidance Policy indicates that Table 3, entitled "Penalties per ton of pollutant over the annual allowable" provides in relevant part:

| SEVERE NON-ATTAINMENT AREAS FOR VOC AND NOx | First 25 tons | Emissions in Excess of 25 tons |
|---|---|---|
| *Willful or* 2nd year | $800 | $1600 |
| Negligent | $600 | $1200 |

Guidance Policy at 13; R.R. 888a (emphasis added).

As the Department points out, Sunoco was fully aware of the legal requirements of the 1995 Plan Approval and Permit, but did not comply with its obligation to install the approved RACT equipment. In addition, the Department asserts that it is not bound by the Guidance Policy and thus, that it may deviate from it.[10]

We agree with the EHB that given the circumstances in this case, *i.e.*, Sunoco's conscious choice to keep operating Boilers 6 and 7 while failing to even attempt to timely comply with the 1995 Plan Approval and Permit, and the fact that the facility is

10. The Department's disclaimer on the first page of the Guidance Policy states:
> The policies and procedures herein are not an adjudication or a regulation. There is no intent on the part of the Department to give these rules that weight or deference. This document establishes the framework

for the exercise of [the Department's] administrative discretion in the future. *[The Department] reserves the discretion to deviate from this policy statement if circumstances warrant.*
Guidance Policy at 1; R.R. 876a (emphasis added).

located in a severe non-attainment area, the imposition of the $800/$1,600 per ton figure for emissions over allowable for the first year of noncompliance did not amount to a true deviation from Section V of the Guidance Policy. As such, we conclude that the EHB did not err in upholding that determination.

## IV.

■ Sunoco's fourth argument is that the EHB erred in upholding the Department's increase of the first year's emission-based penalty inasmuch as the Guidance Policy directs that a timely initial RACT submission shall earn a reduction in the first-year penalty. Sunoco cites to the adjustment factors listed under Section IX. *See* Guidance Policy at 21; R.R. 896a. Specifically, Adjustment Factor B, relating to degree of cooperation, provides: "use – 0.1 for submission of RACT Plan on time. Where companies are later found which have not submitted a plan you may elect to use + 0.1." *Id.*

Sunoco points out that the Department used a + 0.1 (10%) lack of cooperation adjustment factor for both boilers, which amounted to a 20% increase in the penalty. Sunoco contends that insomuch as it timely submitted its 1994 RACT proposal, there is no factual basis to justify the Department's failure to reduce the penalty by 10%.

In response, the Department contends that with regard to the 10% upward adjustment based on Sunoco's lack of cooperation, there is ample evidence of Sunoco's deliberate failure to install the legally required RACT equipment. We agree. As the EHB noted in its decision, the evidence reveals Sunoco's low degree of cooperation. For example, instead of attempting to comply with or appeal from the 1995 Plan Approval and Permit, Sunoco submitted about a dozen deficient applications

seeking to change the 1995 RACT determination. These applications often contained miscalculations and frequently changed the control efficiencies of the proposed RACT without any documentation or support.

In other words, although Sunoco timely submitted its 1994 RACT proposal, which was approved in 1995, it never took any steps to install the RACT controls contained in the 1995 Plan Approval and Permit. As the Department analogizes in its brief, Sunoco's conduct is best described as being similar to that of someone who pays a bill with a check, puts a "stop payment" order on the check and then complains that he should not be charged a late fee for not paying on time.

Nevertheless, Sunoco contends that the mere fact that it submitted the 1994 application on time is sufficient for it to be entitled to the 10% reduction, regardless of whether it later complied with the 1995 Plan Approval. We disagree. To reiterate, Sunoco never appealed from the 1995 Plan Approval, but continued to operate both boilers past May 31, 1996 without installing the approved RACT equipment. In view of Sunoco's deliberate lack of cooperation, we conclude that the EHB did not err in upholding the Department's decision not to apply the 10% reduction in the calculation of the first-year penalty.

## V.

■ Sunoco's fifth argument is that the Department also increased the penalty amount using the lack of cooperation adjustment factor based on the same facts, *i.e.*, Sunoco's noncompliance and the fact that the Department had to issue an Abatement Order, which it used to increase the penalty for the "compliance history" adjustment factor.

Section IX(3) of the Guidance Policy permits a penalty to be adjusted for both degree of cooperation *and* compliance history. Subsection 3(D), relating to the compliance history adjustment factor, provides: *"absent special circumstances, this factor will not be used for the initial extension;* however this factor could be used in the future if a company fails to comply with the compliance schedule or other related terms of their permit." Guidance Policy at 21; R.R. 896a (emphasis added).

In support of its position, Sunoco cites *American Auto Wash, Inc. v. Department of Environmental Protection,* 729 A.2d 175 (Pa.Cmwlth.1999), where this Court determined that the Department unreasonably imposed a 10% increase in the base penalty imposed on the owner of a gasoline station who failed to install the required vapor recovery technology. We concluded that the 10% increase, which was based on the average monthly "throughput" of gasoline (amount of gallons pumped per month) was unreasonable inasmuch as the base penalty itself was also calculated based on the same throughput. Therefore, Sunoco asserts that in the present case, the Department unreasonably increased the base penalty for compliance history for which it had already increased the base penalty for lack of cooperation based on the same set of facts. Sunoco further asserts that this error increased its penalty by $142,640.

In response, the Department contends that Sunoco failed to preserve this claim because it did not raise this issue in its post-hearing brief to the EHB. In support of its position, the Department cites *Wilbar Realty, Inc. v. Department of Environmental Resources,* 663 A.2d 857 (Pa. Cmwlth.1995), where this Court stated that issues not raised in a post-hearing brief to the EHB are waived.

Although Sunoco argues that it preserved this issue by arguing in its pre-and post-hearing memoranda that the Department improperly applied the adjustment factors, our review of the record does not indicate that Sunoco specifically raised the "double-counting" issue before the EHB. As such we are inclined to agree with the EHB that Sunoco has not preserved this issue for our review. *Wilbar Realty, Inc.*

Nonetheless, we also agree with the Department's alternative position that it did not adjust Sunoco's first-year penalty based upon its compliance history and, therefore, that there was no "overlap" in the underlying facts used to support both adjustments to Sunoco's base penalty. The Department's penalty calculations for Boilers 6 and 7 clearly reflect that the compliance history adjustment factor was not used to increase the first-year penalty for either boiler. *See* Hearing Exhibit C–22; R.R. 1276a–1277a.

As the Department further points out, the adjustment for Sunoco's compliance history reflected the "duration of the violation" during Sunoco's second through sixth years of noncompliance and is not directly related to the degree of cooperation shown by Sunoco in resolving the violation. Section 9.1(a) of APCA, 35 P.S. § 4009.1(a), requires that the Department consider the duration of the violation in determining the amount of the penalty. As indicated by Section 9.1(a), the "duration of the violation" is to be considered in *addition* to the "degree of cooperation" shown in resolving the violation in determining the amount of the penalty.

Consequently, the Department did not use the same facts to support both adjustments and, therefore, Sunoco's reliance on our decision in *American Auto Wash, Inc.* is misplaced. As a result, we conclude that the EHB did not err in upholding the Department's use of both the degree of cooperation and compliance history adjust-

ment factors to increase Sunoco's base penalty.

## VI.

In view of the foregoing, we conclude that the record reflects that the Department properly applied the criteria contained in Section 9.1(a) of APCA, 35 P.S. § 4009.1(a), for determining the amount of Sunoco's civil penalty and that the Department's penalty assessment *reasonably fits* Sunoco's violations. Therefore, we further conclude that the EHB did not err or abuse its discretion in upholding the Department's penalty assessment as being reasonable and in accord with the applicable law. *Westinghouse Elec. Corp.* Hence, we affirm.

## *ORDER*

AND NOW, this 7th day of January, 2005, the April 12, 2004 order of the Environmental Hearing Board is hereby AFFIRMED.