**EUREKA STONE QUARRY, INC., Petitioner**

v.

**DEPARTMENT OF ENVIRONMENTAL PROTECTION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued June 12, 2008.

Decided Sept. 12, 2008.

Stephen B. Harris, Warrington, for petitioner.

Adam N. Bram, Asst. Counsel, Norristown, for respondent.

BEFORE: PELLEGRINI, Judge, LEAVITT, Judge, FLAHERTY, Senior Judge.

OPINION BY Senior Judge FLAHERTY.

Eureka Stone Quarry, Inc. (Eureka) petitions for review from an order of the Environmental Hearing Board (Board) which sustained in part and dismissed in part Eureka's appeal, reducing the January 3, 2006 civil penalty assessment from $126,550.00 to $69,600.00, reducing the June 29, 2006 civil penalty assessment from $48,750.00 to $23,750.00 and dismissing the appeal from the Department of Environmental Protection's (Department) January 3, 2006, placement of Eureka on

the Department's Air Quality Compliance Docket (Compliance Docket). We affirm.

This is a case of first impression, as only one other company has been placed on the Compliance Docket during its 15 year existence and that company was on the Compliance Docket for less than a week; so, there has been virtually no litigation addressing the issues raised by Eureka in its appeal.

Eureka owns and operates three quarries in Bucks County, the Rush Valley quarry, the Chalfont quarry, and the Warrington quarry. Each quarry has a crushing system consisting of primary, secondary and tertiary crushers and related screens and conveyor systems. Chalfont and Rush Valley also have hot mix asphalt plants associated with them. Chalfont and Rush Valley have operating permits under the Air Pollution Control Act (Act), Act of January 8, 1960, P.L. (1959) 2119, *as amended*, 35 P.S. §§ 4001–4106. Warrington does not have a hot mix asphalt plant, nor does it have a permit under the Act.[1]

On October 26, 2000, Eureka operated the baghouse associated with its asphalt plant at Rush Valley in a manner such that its pressure drop was at 0 w.g., which is 5 w.g. below the limit set forth in its operating permit. On June 8, 2001, Eureka operated Rush Valley in such a manner that caused emission of fugitive dust into the outdoor atmosphere from one of its asphalt plants. On that same date, the Department discovered that Eureka was not maintaining a log of its road cleaning and sweeping operations at Rush Valley, as required by its operating permit.

On October 18, 2001, Eureka operated its Chalfont quarry in a manner that caused the emission of fugitive dust into the outdoor atmosphere. On April 2, 2002, the Department discovered that Eureka had failed to maintain daily records of preventative maintenance of the fabric collectors on the stone crusher at Chalfont, as required in its operating permit.

On November 15, 2001, February 26, 2002, April 11, 2002, June 20, 2002, and June 5, 2003, Eureka operated the Rush Valley facility in a manner that caused the emission of fugitive dust into the outdoor atmosphere from one of its asphalt plants, its stone crushing plant or the baghouse. Also, on February 26, 2002, the Department discovered that Eureka had failed to maintain daily records of pressure drop readings, collector exhaust conditions, and preventive maintenance of the fabric collectors at Rush Valley, as required in its operating permit. On October 17, 2002, Eureka operated one of its asphalt plants at Rush Valley in a manner that caused visible emissions into the outdoor atmosphere, such that the opacity of the emissions were over 20 percent over six-minute and fifteen-second periods during twenty-seven separate readings by the Department.

On June 5, 2003, Eureka operated one of its asphalt plants at Rush Valley in a manner that caused visible emissions into the outdoor atmosphere such that the opacity of the emissions were over 60 percent over six-minute and fifteen-second periods during twenty separate readings by the Department. On September 9, 2003, Eureka operated Rush Valley in such a manner that it caused the emission of fugitive dust into the outdoor atmosphere from its stone crushing plant at its secondary crusher house, the scalper house, and secondary screen house.

1. The parties have stipulated to the facts of the case. Thus, the facts are not at issue in this matter.

On June 14, 2004, the Department and Eureka entered into the June 14, 2004 Consent Assessment of Civil Penalties (June 14, 2004 CACP) and Eureka paid a civil penalty in the amount of $41,100.00. This CACP resolved Eureka's civil penalty liability for conduct at Rush Valley and Chalfont from October 26, 2000 through September 9, 2003, which the Department had determined to be in violation of the Act, 35 P.S. §§ 4001–4106. Eureka agreed to the truth and accuracy of most of the findings set forth in the June 14, 2004 CACP and agreed not to challenge the findings in any other proceedings.

Beginning on September 20, 2004, the Department conducted a series of inspections at the three quarries. On September 20, 2004, Robert Guzek (Guzek), the Department Inspector, and Christian Vlot (Vlot), the Compliance Specialist, inspected Chalfont and observed fugitive dust coming from the belt scraper being used on the conveyor to the final screen house at the stone crushing plant. On that same date, Guzek requested that Eureka provide the Department with required volatile organic compounds (VOC) and nitrogen oxide compounds ($NO_x$) emissions records. Eureka did not provide those records to the Department upon its request.

On April 22, 2005, Guzek and District Supervisor Shawn Mountain (Mountain) inspected Chalfont. During the inspection of the asphalt plant operations, they observed fugitive dust coming from the tertiary crusher and screen house, from a window and transfer point at the secondary crusher, and from an opening in the conveyor cover between the primary and secondary crusher house.

On June 23, 2005 and August 12, 2005, Guzek inspected Chalfont and observed fugitive dust coming from the primary crusher dump hopper when trucks were unloaded.

On September 9, 2005, Guzek and former Air Quality Specialist Brady Wassom inspected Chalfont and observed fugitive dust coming from the primary crusher dump hopper when trucks were unloaded, from the conveyor off of the primary crusher near the belt tensioner, from an opening in the conveyor cover for the conveyor leading from the primary crusher, and from underneath the screening bin house.

On November 7, 2005, Guzek inspected Chalfont and observed fugitive dust coming from an opening in the screening house and from a belt scraper on the conveyor belt leading to the final screening house.

On February 10, 2006, Mountain and former Inspector Rebecca Schremp inspected Chalfont and observed fugitive dust coming from the primary crusher during dumping of trucks, from the crusher itself during operation, from the loading of bin trucks, from the bottom of the creek screen house, from the use of the haul road in the pit by truck traffic and from the creek screen house in the area where the upper conveyor enters the building.

On May 23, 2006, Guzek and former Inspector Andrea Kalup (Kalup) inspected Chalfont and observed that Eureka had begun installation of two National Environmental Service Co., Inc. (NESCO) wet suppression control device systems at Chalfont's stone crushing facility without first obtaining a plan approval from the Department.

With respect to Rush Valley, Guzek and Vlot inspected it on September 17, 2004, and observed that Eureka was not keeping VOC and $NO_x$ emissions records for Rush Valley in the manner required by the operating permit, was not keeping records of daily facility monitoring for malodors, visible emissions, and fugitive emissions, and was not keeping a maintenance log for the

baghouse of the tertiary crusher. On that same date, Guzek and Vlot observed fugitive dust coming from the transfer point from the primary crusher and from the transfer point from the secondary crusher at Rush Valley.

On April 22, 2005, Guzek and Mountain inspected Rush Valley and observed that the manometer on the facility's tertiary crusher baghouse was cracked, disconnected and inoperable. On June 22, 2005, Guzek and two former Air Pollution Control Engineer 2's, David Caracappa and Nicholas Leslie (Leslie), inspected Rush Valley and observed fugitive particulate matter being emitted into the atmosphere from excavation activities on site. On June 28, 2005, Guzek and Kalup inspected Rush Valley and observed fugitive dust coming from the primary crusher transfer point to the conveyor and from underneath the conveyor cover at the primary crusher.

On July 7, 2005, Guzek inspected Rush Valley and observed that Eureka had connected and installed an operable manometer for the tertiary baghouse. Eureka stated that it installed the new manometer on July 7, 2005.

On August 12, 2005, Guzek inspected Rush Valley and observed fugitive particulate matter was being emitted into the atmosphere from excavation activities on site. On that same date, Guzek observed fugitive dust coming from the primary crusher transfer point to the conveyor and from underneath the conveyor cover at the primary crusher.

On June 14, 2006, Guzek and Leslie inspected Rush Valley and observed that Eureka had erected three new Dillman asphalt silos and constructed a concrete pad for a new asphalt plant without having obtained a plan approval from the Department.

On November 21, 2005, Guzek inspected Warrington and observed fugitive dust coming from the primary crusher dump hopper when trucks were unloaded from the transfer point from the primary crusher to the conveyor and from the secondary crusher house.

On May 23, 2006, Guzek and Kalup inspected Chalfont and observed that Eureka had installed and operated a NESCO wet suppression control device system at Warrington without first obtaining a plan approval and an operating permit from the Department.

On December 12, 2005, the Department received Plan Approval Application No. 09-0031 to install a replacement asphalt plant at Rush Valley. The Department notified Eureka by letter dated December 21, 2005, that it had determined that the plan approval application was complete.

On January 3, 2006, the Department issued to Eureka an Air Pollution Abatement Order and Assessment of Civil Penalties (January Order and Assessment) totaling $136,300.00, which is the subject of this appeal. On that same date, the Department, in a letter, notified Eureka that it was placing Eureka on the Department's Compliance Docket and that pursuant to Section 7.1 of the Act, added by the Act of July 9, 1992, P.L. 460, 35 P.S. § 4007.1, and Section 127.412(g) and (h) of the Air Quality Regulations, 25 Pa.Code § 127.412(g) and (h), the Department would not issue any air quality operating permits or plan approvals to Eureka or any related party in Pennsylvania, for as long as Eureka was on the Compliance Docket.[2] The parties later stipulated that

---

2. Subsequent to the January Order and Assessment, Vlot determined that he had doubled Eureka's penalties for fugitive emission

violations at Warrington on November 21, 2005, based upon the incorrect assumption that Warrington operated under an Air Quali-

the correct amount of civil penalties the Department stated was due was $126,550.00, not $136,300.00.

On January 23, 2006, the Department notified Eureka by letter that it had stopped review of its Plan Approval Application No. 09–0031 to install a replacement asphalt plant at Rush Valley because of its placement on the Compliance Docket and that it would not resume its review until Eureka complied with the order requirements of January 3, 2006. On January 31, 2006, Eureka sent the Department a letter, responding to the Order and Assessment of January 3, 2006, which required Eureka to submit by February 1, 2006, a short-term compliance plan for all three of the quarries.

On February 1, 2006, Eureka filed a notice of appeal of the Department's January Order and Assessment and of the Department's January 3, 2006 letter placing Eureka on the Compliance Docket.

On February 3, 2006, the Department and Eureka met to discuss compliance generally, the January Order and Assessment, the significance of the Compliance Docket, Eureka's plans for short-term compliance, ideas for operation and maintenance to achieve long-term compliance, and for submission of plans to the Department by March 1, 2006, as required by the January Order and Assessment.

On March 1, 2006, Eureka submitted a letter to the Department setting forth its plans to achieve long-term compliance with the violations contained in the January Order and Assessment. In that letter, Eureka detailed how it evaluated control systems and selected NESCO to install new wet suppression control device systems at the three quarries. Eureka provided NESCO's proposals for the installation of the systems along with the plan.

On April 14, 2006, the Department received three applications from Eureka for plan approvals for a wet dust suppression air-cleaning device for its existing stone crushing plants at Rush Valley, Chalfont and Warrington. On May 1, 2006, the Department and Eureka entered into a Consent Order and Agreement (Agreement). On that same date, the Department removed Eureka from the Compliance Docket.

On June 29, 2006, the Department issued an Assessment of Civil Penalties (June Assessment) against Eureka in the amount of $52,000.00.[3] The parties later stipulated that the correct amount the Department believes is due is $48,750.00. On July 28, 2006, Eureka filed a notice of appeal of the Department's June Assessment.

On November 15 and 27, 2006, the Department issued Plan Approvals No. PA–

---

ty State Operating Permit. This error resulted in three penalties being $3,250.00 higher than suggested by the Air Quality Civil Penalty Assessment Policy. The Department informed Eureka that the civil penalties were $9,750.00 too high and that Eureka could reduce its payment by that amount. The parties stipulate that the amount of civil penalties that the Department has determined to be due for the violations in the January Order and Assessment is $126,550.00.

**3.** Again, subsequent to the Department issuing the June Assessment, Vlot determined that he had doubled the penalties for fugitive emis-

sion violations at Warrington on June 12, 2006, based upon the incorrect assumption that Warrington operated under an Air Quality State Operating Permit. This error resulted in one penalty for a single violation at Warrington being $3,250.00 higher than that suggested by the Air Quality Civil Penalty Assessment Policy. The Department informed Eureka that the civil penalties for the June Assessment can be reduced by that amount. The parties stipulated that the amount of civil penalties due for the violations in the June Assessment is $48,750.00.

09–0031A, No. PA–09–0032, and No. PA–09–0189, for two water spray suppression systems to be installed as air pollution control devices for the existing stone crushing plants at Rush Valley, Chalfont and Warrington. Condition # 007 of Section C of the State Only Operating Permit No. 09–00031 for Rush Valley, requires that the permittee not allow its total $NO_x$ and VOC emissions for the entire facility to exceed 25 tons per year, on a twelve-month rolling basis. Condition # 013 of Section C of the State Only Operating Permit No. 09–00031 for Rush Valley, requires that:

(a) The permittee shall monitor the facility, once per day, for the following:

(1) Odors, which the Department may determine to be objectionable.

(2) Visible Emissions.

(3) Fugitive Particulate Matter.

(b) All detectable fugitive particulate emissions, and/or objectionable odors, that originated on-site and cross the property line as well as visible emissions that originate on site shall:

(1) Be investigated.

(2) Be reported to the facility management, or individual(s) designated by the permittee.

(3) Be recorded in a permanent written log.

Condition # 016 of Section C of the State Only Operating Permit No. 09–00031 for Rush Valley, requires that the permittee shall maintain sufficient records on a monthly basis and perform calculations demonstrating compliance with the $NO_x$ and VOC emission limits for the entire site. Condition # 003 of Source 115 of State Only Operating Permit No. 09–00031 for Rush Valley requires that the permittee shall record the following daily:

(1) pressure drop readings of the baghouse

(2) collector exhaust condition (e.g. visible or not)

(3) preventive and corrective maintenance preformed on fabric collectors associated with this source.

Condition # 004 of Source 115 of the State Only Operating Permit No. 09–00031 for Rush Valley, requires that the permittee shall maintain pressure drop monitors in operable condition on all fabric collectors which are associated with air contamination sources for this source.

Condition # 007 of Section C of the State Only Operating Permit No. 09–00032 for Chalfont, requires that the permittee not allow its total $NO_x$ and VOC emissions for the entire facility to exceed 24.9 tons per year, on a twelve-month rolling basis. Condition # 017 of Section C of State Only Operating Permit No. 09–00032 for Chalfont requires that the permittee shall maintain sufficient records on a monthly basis and perform calculations demonstrating compliance with the $NO_x$ and VOC emission limits for the entire site.

On December 14, 2006, the Department issued an Assessment of Civil Penalties (December Assessment) in the amount of $13,000.00 for violations of erecting three Dillman asphalt silos and constructing a concrete pad for a new asphalt plant at Rush Valley without obtaining a plan approval from the Department. Eureka resolved its civil penalty liability for its conduct at Rush Valley on June 14, 2006, by payment of a civil penalty of $5,000.00 and execution of a Consent Assessment of Civil Penalties on January 16, 2007. The December 14, 2006 Assessment was not appealed by Eureka.

Thereafter, Eureka filed timely appeals of the January Order and Assessment, the letter of January 3 and the June Order and Assessment. Regarding the January Order and Assessment, Eureka argued be-

fore the Board that the Department committed an error of law and abused its discretion by placing Eureka on the Compliance Docket, and also challenged the Department's conclusion that certain enumerated actions violated the Act. Eureka further argued that the assessment of civil penalties in the amount of $136,000.00, later reduced to $126,550.00, was unreasonable. Regarding the June Assessment, Eureka challenged as unreasonable the assessment of a $52,000.00 civil penalty, which was later reduced to $48,750.00.

The Board consolidated the appeals and held a hearing. On August 6, 2007, the Board ordered the Department to reduce the January civil penalty assessment from $126,550.00 to $69,600.00; to reduce the June 29, 2005 civil penalty assessment from $48,750.00 to $23,750.00 and dismissed Eureka's appeal from the Department's January 3, 2006 placement of Eureka on the Compliance Docket. Eureka now petitions our court for review.

Eureka contends that the Board abused its discretion and committed an error of law in finding that the Department did not err in placing Eureka on the Compliance Docket and in not abating the civil penalties in their entirety as a sanction for the Department erroneously placing Eureka on the Compliance Docket; in finding that excavating is not exempt as "clearing of land" under the Department's fugitive air contaminant regulations; in finding that the Department did not err in assessing a penalty for a broken manometer when the crusher it monitored was not operated during the time the manometer was broken; in finding that the civil penalties assessed were reasonable when the Department's method of imposing penalties is unreasonable and a violation of due process; and in not further reducing the penalties because the finding of moderate environmental damage was not supported by substantial

evidence and the violations were not willful.

 Our review of the Board's order is limited to determining whether the Board's findings are supported by substantial evidence and whether constitutional violations or errors of law were committed. *Westinghouse Electric Corporation v. Department of Environmental Protection,* 745 A.2d 1277 (Pa.Cmwlth.2000). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Department of Environmental Resources v. Borough of Carlisle,* 16 Pa.Cmwlth. 341, 330 A.2d 293, 298 (1974). An administrative agency has broad discretion in the performance of its administrative duties and functions and this court cannot overturn an agency's exercise of its discretion absent proof of fraud, bad faith, or blatant abuse of discretion. *Herzog v. Department of Environmental Resources,* 166 Pa. Cmwlth. 114, 645 A.2d 1381 (1994). In addition, we have held that the resolution of conflicts in testimony, the credibility of witnesses, and the weight given the evidence are within the province of the Board. *Pawk v. Department of Environmental Resources,* 39 Pa.Cmwlth. 457, 395 A.2d 692 (1978). Further, the Department shall have the burden of proof when it files a complaint for a civil penalty. 25 Pa.Code § 21.101.

### Compliance Docket

Initially, Eureka contends that the Board abused its discretion and committed an error of law by finding that the Department did not err in placing Eureka on the Compliance Docket and by not abating the civil penalties in their entirety as a sanction for the Department erroneously placing Eureka on the Compliance Docket. Specifically, Eureka argues that it does not lack the intention or ability to comply with

the Department's regulations and that the Department erred when it failed to engage in the required informal process to address the alleged lack of intention and ability to comply before it placed Eureka on the Compliance Docket.[4]

Both the Act and the regulations provide the authority for the Department to place Eureka on the Compliance Docket. Section 7.1 of the Act, 35 P.S. § 4007.1(b) provides in pertinent part as follows:

> (b) The department may refuse to issue any plan approval or permit pursuant to this act if it finds that the applicant or permittee or a partner, parent or subsidiary corporation of the applicant or permittee has shown a lack of intention or ability to comply with this act or the regulations promulgated under this act or any plan approval, permit or order of the department, as indicated by past or present violations, unless the lack of intention or ability to comply is being or has been corrected to the satisfaction of the department.

Section 127.412 of the regulations, 25 Pa. Code § 127.412(f) and (g) provide in pertinent part as follows:

> (f) If the Department finds that the applicant or related party has an existing or continuing violation or lacks the intention or ability to comply with the act, or the rules or regulations promulgated under the act, or a plan approval operating permit or order of the Department, as indicated by past or present violations, the Department will attempt to resolve the violations or lack of intention or ability to comply informally.

> (g) If the Department is unable to resolve the violation or lack of intention or ability to comply on an informal basis, the Department will place the violation and may place the lack of intention or ability to comply on the compliance docket. The violation or lack of intention or ability to comply shall remain on the compliance docket until it is resolved to the satisfaction of the Department.

Further, the Department also follows the Compliance Docket Procedure, Doc. No. 273–4130–004 (Procedure) in determining whether to place a company on the Compliance Docket. The Procedure provides in pertinent part as follows:

> The decision to place an applicant or permittee on the compliance docket may be made at any time. When an existing or continuous violation is identified, the regional staff must decide whether the violation can be resolved informally, corrected or satisfactory progress toward correction or whether formal action, including the use of the compliance docket, is warranted.

> In general, the procedures described in the previous section should be followed. The regional manager and litigation attorney should be briefed concerning the violation. Failure to resolve the violation will place the permittee or applicant on the compliance docket. The informal resolution process described above should be followed. In other words, a letter should be transmitted to the applicant providing an opportunity to resolve the violation within a certain time frame. A **compliance notification** letter is attached to this procedure for this purpose. If the problem is not re-

---

4. The Board determined that Eureka's appeal of its placement on the Compliance Docket was not moot as a result of Eureka being removed from the Compliance Docket because Eureka has a continuing stake in the controversy as the Department considers past compliance history in assessing violations. Furthermore, the issue of whether or not the Department properly placed Eureka on the Compliance Docket would evade review if Eureka's appeal was dismissed as moot.

solved, a compliance docket notification letter should be sent to the responsible party. The decision to place a company on the docket is appealable within thirty (30) days to the Environmental Hearing Board.

Procedure, Exhibit C–72, R.R. at 626a (emphasis in original). The Department sent Eureka a letter on January 3, 2006, which informed Eureka that it was being placed on the Compliance Docket because the Department had found that Eureka lacked the intention or ability to comply with the Act and regulations.[5] The letter stated in pertinent part as follows:

On June 15, 2004, Eureka ... and the Department ... executed a Consent Assessment of Civil Penalty ("CACP") to resolve numerous violations at Eureka's Rush Valley and Chalfont facilities that occurred between October 18, 2001, and September 9, 2003. Many of the violations covered by the June 15, 2004 CACP were related to fugitive emissions and inadequate operation and maintenance of the sources and controls at those two facilities. Since the execution of that agreement, Eureka has continued to violate the regulations promulgated under the Pennsylvania Air Pollution Control Act and conditions in its Operating Permits. We have sent six Notices of Violation to Eureka's Chalfont Quarry, four to the Rush Valley Quarry, and one to the Warrington Quarry. The majority of these violations were again due to fugitive dust emissions. Furthermore, we have not received the abatement plans that the Department requested in the September

13, 2005, November 9, 2005, and the November 23, 2005 Notices of Violation. The Department has attempted to resolve these violations informally but has been unable to do so because of the lack of any response from Eureka.

We have determined that Eureka lacks the intention and ability to comply with the Department's air quality regulations. Therefore, in accordance with 25 Pa.Code Section 127.412(g), you are hereby notified that the Department is placing Eureka on the Department's Compliance Docket.

Department Letter, January 3, 2006, at 1.

A review of the record reveals that the Department considered Eureka's past violations, having been previously cited for 43 air quality violations at the three quarries over a four year time period, that Eureka had committed 27 additional violations of the regulations in the fall of 2005 and that Eureka had been operating in a near constant state of noncompliance.

■ The Department also considered that Eureka had taken a few steps to address the problems. However, over a two year period, from November 2003 through November 2005, the record reflects that Eureka continued to violate the Act and took inadequate steps to prevent such violations.[6] The record further reveals that the Department placed Eureka on the Compliance Docket due to continued violations of the regulations and not receiving the abatement plans that had been requested by the Department on September 13, and November 9 and 13, of 2005. Department Letter, January 3,

---

**5.** Thereafter Eureka entered into a consent agreement with the Department and was removed from the Compliance Docket on May 1, 2006.

**6.** Eureka contends that it was in compliance at the time the Department decided to place it

on the Compliance Docket. However, the record reflects that Eureka was in a state of continuous non-compliance and had failed to respond to the Department's requests for abatement plans.

2006, at 1. The Department further stated that they had attempted to resolve the matter informally, but that Eureka had failed to respond to the Department. *Id.* The Department concluded that Eureka lacked the intention and ability to comply with the Department's regulations. *Id.* The finding of the Board that there was adequate evidence to put Eureka on the Compliance Docket was supported by substantial evidence of record.

### Informal Resolution

Eureka further contends that the Department did not attempt to resolve the matter informally, as required by 25 Pa. Code § 127.412(g). However, the record reflects that the Department had warned Eureka by letter in 2003 and in person in 2004 that they may be placed on the Compliance Docket. The Department worked with Eureka for a number of years attempting to get Eureka in compliance and only placed Eureka on the Compliance Docket after Eureka continued to violate the regulations and failed to respond to the Department's requests for abatement plans.

Eureka complains that it lost money, as permits it was seeking were denied because it was placed on the Compliance Docket. A permit will be denied if "[t]he applicant or a related party has a violation or lack of intention or ability to comply that is listed on the compliance docket." 25 Pa.Code § 127.422(5). We note that the financial state of a company being placed on the Compliance Docket is not a consideration. Section 9.1 of the Act, added by the Act of October 26, 1972, P.L. 989, *as amended,* 35 P.S. § 4009.1.[7] The record reflects that by late November of 2005, Eureka had open air quality violations at Chalfont and Warrington, it had not responded to three notices of violations (NOVs), in which the Department had requested abatement plans, and it had done nothing substantial to demonstrate that it had the ability or intent to comply with the Act and regulations. The Board was correct in determining that the Department's action of placing Eureka on the Compliance Docket on January 3, 2006, was reasonable and appropriate, as Eureka lacked the ability and/or intent to comply with the air quality laws.

### Clearing of Land

■ Next, Eureka contends that the Board abused its discretion and committed an error of law by finding that excavating is not exempt as "clearing of land" under the Department's regulations. Eureka was charged with a violation on June 22, 2005 and August 12, 2005 for removing overburden, extracting soil down to bedrock and transporting it elsewhere by

---

7. The Board's review of a civil penalty assessment under the Act is guided by Section 4009.1 of the Act:

 (a) In addition to proceeding under any other remedy available at law or in equity for a violation of a provision of this act or any rule or regulation promulgated under this act or any order, plan approval or permit issued pursuant to this act, the department may assess a civil penalty for the violation. The penalty may be assessed whether or not the violation was willful.... In determining the amount of the penalty, the department shall consider the willfulness of the violation; damage to air, soil, water or other natural resources of the Commonwealth or their uses; financial benefit to the person in consequence of the violation; deterrence of future violations; cost to the department; the size of the source or facility; the compliance history of the source; the severity and duration of the violation; degree of cooperation in resolving the violation; the speed with which compliance is ultimately achieved; whether the violation was voluntarily reported; other factors unique to the owners or operator of the source or facility; and other relevant factors.

trucks to prepare the area for blasting.[8] This excavation caused significant fugitive dust emissions on those dates. Eureka specifically argues that removing soil down to bedrock is an exempt activity under 25 Pa.Code § 123.1(a), which provides in pertinent part as follows:

> (a) No person may permit the emission into the outdoor atmosphere of a fugitive air contaminant from a source other than the following:
>
> * * *
>
> (4) Clearing of land.

The regulations do not provide a definition of "clearing of land." Mr. Guzek testified for the Department that "clearing of land" is the removal of trees, brush and surface vegetation, not the removal of overburden down to bedrock. "Clearing" is defined as "a tract of land cleared of wood and brush." Webster's Third New International Dictionary 420 (1986). The Board, citing a number of Board decisions, determined that the common understanding of the meaning of "clearing of land" is the removal of trees, brush and surface vegetation. As stated previously, the Board has broad discretion and our court cannot overturn an agency's exercise of its discretion absent proof of fraud, bad faith or blatant abuse of discretion. *Herzog.* The Board did not abuse its discretion in determining that excavating is not exempt as "clearing of land" under the Department's regulations.

### Broken Manometer

■ Next, Eureka contends that the Board abused its discretion and committed an error of law in finding that the Department did not err in assessing a penalty for a broken manometer when the crusher it monitored was not operated during the time the manometer was broken.

Condition #004 of Source 115 of State Only Operating Permit No. 09–00031 for Rush Valley requires that "[t]he permittee shall maintain pressure drop monitors in operable condition on all fabric collectors which are associated with air contamination sources for [the tertiary crusher]." State Only Operating Permit No. 09–00031 at 27. The manometer for the tertiary crusher at Rush Valley was broken. Although it was required by Condition #003 of Source 115 to keep daily records of pressure drop for the baghouse, Eureka did not do so; consequently, the Department does not know when the manometer broke. The Board determined that Eureka's failure to have an operable manometer on its tertiary crusher baghouse at Rush Valley constituted a violation of its State Only Operating permit and was, thus, a violation of 25 Pa.Code § 127.444.[9]

The Board took into consideration the fact that the broken manometer was a violation, but also considered that the tertiary crusher and the baghouse may not have been in operation during that period of time when it decided to adjust the pen-

---

**8.** *Overburden is defined in the noncoal mining regulations as "[t]he strata or material overlying a noncoal deposit or in between noncoal deposits in its natural state and material before or after its removal by surface mining."* 25 Pa.Code § 77.1.

**9.** 25 Pa.Code § 127.444 provides as follows: A person may not cause or permit the operation of a source subject to this article unless the source and air cleaning devices identified in the application for the plan approval and operating permit and the plan approval issued to the source are operated and maintained in accordance with specifications in the application and conditions in the plan approval and operating permit issued by the Department. A person may not cause or permit the operation of an air contamination source subject to this chapter in a manner inconsistent with good operating practices.

alty from $1400.00 to $500.00. We note that Section B of the State Only Operating Permit, # 008 provides that, "[i]t shall not be a defense for the permittee in an enforcement action that it was necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of this permit." Thus, Eureka is unable to use as a defense the fact that it had halted the use of the tertiary crusher during the time that the manometer was broken. We further note that because Eureka did not keep the required records, the Department was unable to ascertain whether Eureka did or did not use the tertiary crusher during the time in which the manometer was broken. We are unable to find an abuse of discretion or an error of law in the Board's determination.

**Civil Penalties**

 Next, Eureka contends that the Board abused its discretion and committed an error of law in finding that the civil penalties assessed were reasonable when the Department's method of imposing penalties is unreasonable and a violation of due process. Our review of the reasonableness of civil penalties is confined to whether the Department's assessments, as reduced by the Board, are supported by substantial evidence, whether the Board's decision violated Eureka's constitutional rights or whether the Board erred as a matter of law. *Sunoco, Inc. (R & M) v. Department of Environmental Protection,* 865 A.2d 960 (Pa.Cmwlth.2005). Our court, in addressing the reasonableness and appropriateness of a civil penalty assessment, will not substitute its judgment for that of the Board and we will not disturb the Board's determination if it reasonably fits the violation. A penalty would not reasonably fit the violation if it strikes at the conscience of our court as being unreasonable. *Id.* Our court will not re-evaluate the credibility of witnesses, any conflicts of evidence or the weight the

Board afforded the evidence. *Pennsylvania Trout v. Department of Environmental Protection,* 863 A.2d 93 (Pa.Cmwlth. 2004).

 The Department assessed civil penalties in the amount of $175,300.00 against Eureka. The Board found the penalties assessed were valid, but reduced the amount payable to $93,350.00. The Department's imposition of a civil penalty assessment under the Act is guided by Section 9.1 of the Act:

(a) In addition to proceeding under any other remedy available at law or in equity for a violation of a provision of this act or any rule or regulation promulgated under this act or any order, plan approval or permit issued pursuant to this act, the department may assess a civil penalty for the violation. The penalty may be assessed whether or not the violation was willful. The civil penalty so assessed shall not exceed ten thousand dollars ($10,000.00) per day for each violation which occurs in the first three (3) years following enactment of this section, fifteen thousand dollars ($15,000.00) per day for each violation which occurs in the fourth year following enactment of this section and twenty-five thousand dollars ($25,000.00) per day for each violation which occurs in the fifth year and all subsequent years following enactment of this section.

35 P.S. § 4009.1(a). Section 9.1 of the Act further provides factors which the Department shall consider in determining the amount of the civil penalty under the Act:

In determining the amount of the penalty, the department shall consider the willfulness of the violation; damage to air, soil, water or other natural resources of the Commonwealth or their uses; financial benefit to the person in consequence of the violation; deterrence

of future violations; cost to the department; the size of the source or facility; the compliance history of the source; the severity and duration of the violation; degree of cooperation in resolving the violation; the speed with which compliance is ultimately achieved; whether the violation was voluntarily reported; other factors unique to the owners or operator of the source or facility; and other relevant factors.

35 P.S. § 4009.1(a). The Department also followed its guidance policy entitled Guidance for Application of Regional Civil Assessment Procedure, Doc. No. 273–4130–003 (Guidance Policy), Exhibit C–69, R.R. at 720a–739a. The Guidance Policy contains procedures for calculating penalties for Act violations and uses criteria similar to those found in Section 9.1(a) of the Act.[10] However, the Department is not bound by the Guidance Policy and, thus, may deviate from it. *Sunoco*, 865 A.2d at 972.

The Department, in using the Guidance Policy, considered most of the factors in Section 9.1(a) of the Act. Specifically, Vlot testified that he began with a base penalty in the range of $1500.00 to $2500.00, which the Guidance Policy sets for a willful violation of moderate environmental impact for fugitive emissions. Vlot then chose the highest base penalty in the range, to create a deterrent effect because the lower penalty assessed in 2004 was ineffective at deterring future violations. The Guidance Policy calls for doubling the penalty for permitted facilities. Vlot also applied a 30% multiplier due to Eureka's compliance history and because he considered Eureka to be a recalcitrant violator. Based upon these calculations, each fugitive dust violation at Rush Valley and Chalfont, the permitted facilities, was assessed a penalty of $6500.00. Also, each dust violation at Warrington, the non-permitted facility, was assessed a penalty of $3250.00.

The Board determined that the Department's doubling of the penalty for the two permitted facilities was unreasonable, as the Department did not have any specific reason for the doubling other than the Guidance Policy provides for doubling. The Board further determined that there was no reasonable basis for doubling a penalty simply because a facility holds a permit. The Board further determined that Eureka's conduct was not negligent, but was, at the very least, reckless. The Board stated in pertinent part as follows:

An intentional or deliberate violation of law constitutes the highest degree of willfulness and is characterized by a conscious choice on the part of the violator to engage in certain conduct with knowledge that a violation will result. Recklessness is demonstrated by a conscious disregard of the fact that one's conduct may result in a violation of the law. Negligent conduct is conduct which results in a violation which reasonably could have been foreseen and prevented through the exercise of reasonable care.

Board's Decision, at 34. The Board found Eureka acted recklessly, as it knew the Department was concerned about its fugitive dust emissions and did not develop an effective program to control such dust emissions.

The Board found that the Department improperly applied the criteria contained

---

**10.** The Guidance Policy applies an annual emission limit such as that included in the permit and calculates a "base penalty" by determining the actual quantity of pollutant over the allowable limit (tons over allowable) that was emitted by the violating source. A dollar amount is then assigned to each ton over the allowable limit. The dollar amount is also affected by two other factors, i.e., willfulness and the severity of the violation. The dollar amount is also affected by the geographic area in which the violations occurred.

in Section 9.1(a) of the Act, 35 P.S. § 4009.1(a), for determining the amount of Eureka's civil penalty. The Board's penalty, as modified, reasonably fits Eureka's violations. The Board did not err or abuse its discretion in modifying the penalty assessment, which was reasonable and in accordance with the applicable law.

Finally, Eureka contends that the Board abused its discretion and committed an error of law in not further reducing the penalties because the finding of moderate environmental damage was not supported by substantial evidence and the violations were not willful.

We determined above that the Board did not abuse its discretion or commit an error of law in modifying the civil penalties. Section IX of the Bureau of Air Quality's Civil Penalty Assessment Procedure provides that a moderate environmental impact is one exceeding emission standards, where there has been emission of toxic air contaminants, or where there is on-going violations or citizens complaints. *Id.* at 13; R.R. at 732a. A review of the record reveals that Vlot considered Eureka's fugitive emissions to have a moderate level of environmental impact, as the quarries were "on-going violator[s]". As the Board's decision was supported by substantial evidence of record, we further determine that the Board was correct in not further reducing the penalties.

Accordingly, we affirm.

### ORDER

AND NOW, this 12th day of September, 2008 the Order of the Environmental Hearing Board in the above-captioned matter, is affirmed.

---

1. Eureka believed, incorrectly, that earthmoving did not require a permit because the applicable regulation, 25 Pa.Code § 123.1(a), exempts "clearing of land" from its directive.

### DISSENTING AND CONCURRING OPINION BY Judge LEAVITT.

I respectfully dissent to that part of the majority opinion affirming the Department's decision to place Eureka on the Compliance Docket. The seriousness of the Department's action must not be underestimated. So long as Eureka remained on the Compliance Docket, the Department would not issue any operating permits or plan approvals to any of Eureka's three quarries, regardless of the compliance record of a particular quarry. The Department took this drastic action because it "determined that Eureka lacks the intention and ability to comply with the Department's air quality regulations." Reproduced Record at 636a (R.R. ——). In my view, however, the record supports the contrary conclusion. At the time Eureka was placed on the Compliance Docket, it did not lack the intention or ability to comply with the pertinent regulations but, rather, manifested the contrary.

The record establishes that Francine Carlini, the Department's Regional Program Director for Air Quality, decided to place Eureka on the Compliance Docket after she learned of fugitive dust resulting from earthmoving activities at Eureka's Rush Valley facility in June and August of 2005. EHB Adjudication, August 6, 2007, at 23, Finding of Fact No. 107 (F.F.——).[1] When asked whether "the decision [was] made in September to start that process," Ms. Carlini replied, "I would say that's accurate, in the fall of '05." Notes of Testimony (N.T. ——), March 22, 2007, at 530; R.R. 187a. At the time Carlini made her decision, however, Rush Valley was in compliance with the pertinent regulations.

---

Eureka may have misconstrued the regulation, but its position is colorable. Further, the meaning of "clearing of land" had never been construed by a court.

The Department's inspector, Robert Guzek, specifically noted in his inspection report, "[a]s of September 9, 2005, the facility appears to be in compliance with Air Quality Laws and Regulations." R.R. 552a. Additionally, the Board found as follows:

40. Eureka also submitted an abatement plan for Rush Valley by letter dated September 6, 2005, stating that it would install more misting sprays and use a water truck to control emissions from the excavation activities. Eureka, in fact, completed this work by Mr. Guzek's next inspection in September. (Ex. C-51; Guzek, N.T. 154-55)

41. By operating water trucks in the area of excavation activities and installing and operating water sprays at the primary crusher transfer points, Eureka could sufficiently control fugitive emissions from those sources, as evidenced by the Department's inspection of the Rush Valley Eureka facility on September 9, 2005. (Ex. C-49; Guzek, N.T. 155-156)

42. On September 9, 2005, Robert Guzek inspected the Rush Valley facility. He found that the violations which had been cited in his earlier inspections had been rectified and that the facility was in compliance with air quality laws and regulations. (Guzek, N.T. 155; 254-55; Ex. C-49)

EHB Adjudication, August 6, 2007, at 11, F.F. 40–42. The results of the September 9, 2005, inspection, which was the last inspection of Rush Valley before Eureka was placed on the Compliance Docket, demonstrate Eureka's intention and ability to comply with the Air Quality Regulations at that facility.

Eureka's Warrington quarry had a record of five straight annual full compliance inspections without a single violation. N.T., March 22, 2007, at 534; R.R. 188a. Admittedly, in late November 2005, there was an inspection of the Warrington facility that resulted in a notice of violation being issued; however, as Ms. Carlini's testimony indicates, the decision had been made to place Eureka on the Compliance Docket before the November inspection. In any event, five consecutive years of full compliance followed by one violation does not demonstrate a lack of intention and ability to comply with the Department's Air Quality Regulations.

Eureka's Chalfont quarry had a series of violations; however, Eureka's response to those violations indicated both an intention and an ability to comply with the regulations just as it had at Rush Valley. The first inspection of the Chalfont quarry at issue in the underlying proceedings occurred on September 20, 2004. Guzek issued a notice of violation for fugitive dust emanating from the transfer point between the conveyor and the final screenhouse, which Guzek concluded stemmed from a lack of water suppression. R.R. 426a–427a. James Furey, Eureka's Environmental Safety Director, testified that Eureka immediately installed a water spray on the belt scraper near the entrance to the building, N.T., March 22, 2007, at 609; R.R. 206a, although not in the precise location directed by the Department. N.T., March 20, 2007, at 60; R.R. 68a. Furey explained the reason for installing the water spray in the chosen location, N.T., March 22, 2007, at 609–610; R.R. 206a–207a, and his explanation was not challenged by the Department.

On each subsequent inspection, if fugitive dust was noted, Eureka took steps to address the situation. On June 23, 2005, Guzek inspected the Chalfont quarry and

observed "major dust emanating from the primary crusher hopper when aggregate was being dumped into the hopper." R.R. 456a. Guzek recommended atomizing spray nozzles be added to the hopper, which Eureka installed. N.T., March 22, 2007, at 618; R.R. 209a. Thereafter, at the September 9, 2005, inspection the inspector opined that the atomizing nozzles were not adequate, R.R. 469a, and Guzek recommended "fog-it" nozzles for the area. N.T., March 22, 2007, at 618–619; R.R. 209a. Eureka replaced the atomizing nozzles with fog-it nozzles, which were in addition to the existing deluge nozzles. *Id.* When a subsequent inspection revealed that the fog-it nozzles were not solving the problem, Eureka replaced them with higher-flow fire sprinkler nozzles in order to suppress the dust. N.T., March 20, 2007, at 232; R.R. 111a. In short, during the summer and early fall of 2005, Eureka changed the nozzles on the primary crusher at Chalfont three separate times on the basis of discussions with the Department's inspectors. This demonstrates an intention and ability to comply with the Department's regulations.

Based on the foregoing, the evidence simply does not establish that the Department was justified in placing Eureka on the Compliance Docket for a lack of intention and ability to comply with the Department's Air Quality Regulations. At the time the decision was made to place Eureka on the Compliance Docket, the status of the record was that Rush Valley had come into full compliance; Warrington had five years of full compliance without any violations; and Chalfont was working to come into compliance by, *inter alia*, trying the

various types of water suppression nozzles that the Department suggested to control dust at the primary crusher. Because Eureka came into compliance at two of its facilities and was actively working with the Department to come into compliance at the third, I believe the Department abused its discretion, or misapplied the statute, by placing Eureka on the Compliance Docket.[2] I agree with the majority's disposition of Eureka's remaining issues.

---

**2.** I disagree with Eureka's argument that abating the civil penalties assessed by the Department is an appropriate "sanction" for the Department's abuse of discretion. Unfortunately there is no remedy for the economic losses Eureka claims it suffered while on the Compliance Docket. Eureka is entitled, however, to be retroactively removed from the Compliance Docket since the Department will consider its past compliance history in assessing any future violations.