CONSOL PENNSYLVANIA COAL COMPANY, LLC, Petitioner

v.

DEPARTMENT OF ENVIRONMENTAL PROTECTION, Respondent.

Commonwealth Court of Pennsylvania.

Argued April 5, 2011.
Decided June 30, 2011.

---

Brandon D. Coneby, Pittsburgh, for petitioner.

Barbara J. Grabowski, Pittsburgh, for respondent.

David C. Hook, Waynesburg, for intervenors Kenneth and Kimberly Jones, husband and wife.

BEFORE: LEAVITT, Judge, and BROBSON, Judge, and McCULLOUGH, Judge.

OPINION BY Judge LEAVITT.

Consol Pennsylvania Coal Company, LLC petitions this Court to review an adjudication of the Environmental Hearing Board granting, in part, the appeal of Kenneth and Kim Jones from the Department of Environmental Protection's determination that their 2004 water loss complaint did not include two springs located on their property. The Board held that the Department's investigation should have included an inquiry into whether Consol was responsible for water loss in the two springs. Because the Board erred in finding that the Joneses' water loss claim for the springs was timely, we reverse.

The Joneses own a farm in Greene County consisting of two parcels of land identified for tax purposes as Lot 118 A and Lot 118. The Joneses' home is located on Lot 118A, which is 1.5 acres in size. Lot 118 sits directly across the road and consists of approximately 62 acres of timberland, pasture, and a barn. When the Joneses purchased the parcels in 1993, the only developed water source was a well on Lot 118A. The Joneses developed two springs on Lot 118 and use them to provide their animals with water. The spring developed in 1995 is called the "bathtub spring," which, as its name implies, consists of an old cast iron bathtub placed into the ground and fed from a spring by a plastic pipe. Another spring, developed in 2001 or 2002, is known as the "half-barrel spring," which is a half-barrel placed in the ground and fed by a small plastic pipe. The Board designated the bathtub spring as S2 and the half-barrel spring as S1.

The Bailey Mine is a large underground mine in Greene County that was developed to remove coal from the Pittsburgh coal seam. Consol holds the permit to Bailey Mine. In June 1996, Consol conducted a groundwater inventory of the Joneses' property because it sought to expand Bailey Mine's operations to coal located under the Joneses' farm. The only water source identified in Consol's inventory was the well on Lot 118A. In 2003, Consol retained Moody and Associates to conduct a premining survey of the Joneses' property. Moody conducted pump tests of the original well on Lot 118A and a second well that had been drilled on Lot 118A in 2002. Moody neither identified nor inquired about any water sources on Lot 118.

In February 2004, the Joneses began experiencing a water loss in their wells and notified the Department and Consol. Consol arranged for water to be regularly trucked into the Joneses' farm until July 2006, at which time the Joneses' residence and barn were connected to the public water supply. Reproduced Record at 140a (R.R. ____). The Department investigated and determined that Consol was responsible for the water loss in the Joneses' wells.

In October 2007, the Joneses met with Consol to negotiate payment for their costs associated with the connection to the public water supply. The Joneses also inquired about being reimbursed for the costs associated with their loss of water from the S1 and S2 springs. Consol responded that it was only responsible for the costs associated with the loss of water from the wells because that was the only loss identified in the Joneses' 2004 water loss claim. Further, because more than two years had elapsed since the Joneses had experienced a loss of water from their springs, Consol believed the claim for loss of water from the springs was untimely.

The Joneses informed the Department that Consol refused to compensate them for the loss of water in the springs. In November 2007, the Department sent a letter to the Joneses advising them that because the S1 and S2 springs were never identified as existing prior to the commencement of mining operations, it did not have authority to resolve the Joneses' complaint. The Department treated the Joneses' 2007 claim as a separate water loss claim. The Joneses appealed Consol's denial of their water loss claim to the Board, and Consol intervened. A hearing was held on January 12, 2009.

The relevant testimony can be summarized as follows. Mrs. Jones testified that prior to Consol's pre-mining survey in 2003, the Joneses gave Consol permission to enter upon their land and identify all water sources; she believed that the springs had been identified in that survey. Mrs. Jones testified that when the Joneses lost water on February 12, 2004, she contacted the Department by telephone. A representative from the Department informed Mrs. Jones that she needed to contact Consol, and she did so.

Joseph Matyus, a geologic specialist in the Department's California District Min-ing Office, testified about his investigation of the Joneses' February 2004 water loss claim. Matyus recalled that Mrs. Jones mentioned the springs to him when he investigated the claim in January 2006. However, he did not believe the springs were relevant to his investigation because the complaint form given to him by Consol only identified a water loss in the Joneses' wells, and his records did not identify the existence of any springs.

The Department also offered the testimony of Joe Szunyog, a geologist at the California District Mining Office, who was assigned to investigate the springs. Szunyog authored the November 2008 letter stating the Department did not have authority to hold Consol liable for the water loss in the springs. Szunyog testified that he reached that determination because the springs were not documented as existing or used prior to mining and because there was no pre-mining data on the springs.

Don Teter, a project engineer at Consol, testified. Teter testified that he spoke with Mrs. Jones on February 12, 2004, about the water loss claim. He recalled Mrs. Jones stating that the Joneses were experiencing a water loss and that their well had gone dry. Teter did not recall her mentioning that any other water supplies were also experiencing a water loss. He noted that typically landowners specify each water source that is experiencing a loss. Teter testified that he did not ask Mrs. Jones about any unidentified water sources because he believed the Joneses, as the landowners, would have told him exactly what water losses they were experiencing. In short, Teter believed that only the wells were affected.

On October 6, 2009, the Board issued an adjudication granting the Joneses' appeal, in part, concluding that their 2004 water loss claim included the S1 and S2 springs. The Board based this holding on Consol's

failure to identify the water sources on the Joneses' property accurately. The Board reasoned that had Consol properly documented the springs in its 2003 pre-mining survey, both the Department and Consol would have known the Joneses' water loss claim included the springs and would have conducted their investigations accordingly. The Board explained that it "defied logic" to allow Consol to escape responsibility for replacing a water supply simply because it had failed to document it in its pre-mining survey. The Board remanded the matter to the Department to determine whether Consol's mining activities caused the water loss in the springs. Consol filed a petition for review with this Court, which was quashed as interlocutory.

On January 4, 2010, the Department filed a report of its investigation concluding that the S1 and S2 springs had lost water in 2004 and that Consol was liable. The parties then filed a joint stipulation with the Board on March 8, 2010, with respect to the replacement costs for the wells and springs. On June 11, 2010, the Board issued a Final Order affirming its October 6, 2009, Adjudication. Consol now petitions for this Court's review.[1]

On appeal, Consol contends that the Board erred in finding the Joneses filed a timely water loss claim for the S1 and S2 springs.[2] In support of its argument, Consol argues that under The Bituminous Mine Subsidence and Land Conservation Act (Act),[3] the Joneses' claim was untimely because it was not reported to Consol within two years of the alleged water loss. Second, Consol contends that the Joneses did not offer any evidence to show that their 2004 water loss claim included the springs.

Consol relies on two sections of the Act to argue that the Joneses' water loss claim for the springs was untimely. In relevant part, Section 5.1 of the Act provides:

A mine operator shall not be liable to restore or replace a water supply under the provisions of this section if a claim of contamination, diminution or interruption is made more than two years after the supply has been adversely affected.

52 P.S. § 1406.5a(b). Similarly, Section 5.2 of the Act provides, in pertinent part:

Whenever a landowner or water user experiences contamination, diminution or interruption of a water supply which is believed to have occurred as a result of underground coal mining operations, *that landowner or water user shall notify the mine operator who shall with reasonable diligence investigate the water loss.*

52 P.S. § 1406.5b(a)(1) (emphasis added).[4] The Department's regulation at 25 Pa. Code § 89.146a mirrors Section 5.2.[5]

---

1. Our review of the Board's order is limited to determining whether the Board's findings are supported by substantial evidence and whether constitutional violations or errors of law were committed. *Eureka Stone Quarry, Inc. v. Department of Environmental Protection*, 957 A.2d 337, 344 (Pa.Cmwlth.2008).

2. Consol raises a second issue, *i.e.*, that the Board erred in classifying the S2 spring as a protected agricultural water supply. Because we conclude that the Board erred in finding that the Joneses filed a timely water loss

claim, we need not reach the merits of this issue.

3. Act of April 27, 1966, Special Sess., No. 1, P.L. 31, *as amended*, 52 P.S. §§ 1406.1–1406.21.

4. Both Sections 5.1 and 5.2 of the Act were added by the Act of June 22, 1994, P.L. 357.

5. The regulation repeats the language of Section 5.2 nearly verbatim. It states:

Whenever a landowner or water supply user experiences contamination, diminution

■ Consol maintains that the first time the Joneses advised Consol of water loss in the springs was in 2007, when the Joneses sought reimbursement for the costs they incurred as a result of their loss of water in the springs. Because the claim was made more than two years after their 2004 water loss, it was untimely under Section 5.1. In support, Consol notes that Mrs. Jones testified that she did not recall advising Consol of a water loss in the springs, and Don Teter testified that he did not recall Mrs. Jones specifically mentioning the springs. Furthermore, Consol contends that, even if the Joneses did identify a water loss in the springs, at best they informed the Department, not Consol, in contravention of Section 5.2 of the Act, which requires notice to the mine operator. We agree.

The language of Section 5.1 of the Act is clear: a mine operator is only required to restore or replace a water supply if the affected landowner files a water loss claim within two years of the water supply being adversely affected. 52 P.S. § 1406.5a. Here, because the water in the S1 and S2 springs was adversely affected in February 2004, the Joneses had to notify Consol of that specific loss by February 2006 to hold Consol liable.

The record shows that Consol was not expressly informed of a water loss in the springs before October 2007. The testimony of Mrs. Jones and Don Teter showed that the Joneses informed Consol of "a water loss" on the Joneses' property and that their "well had gone dry." *See* R.R. 80a–81a, 177a, & 390a. Mrs. Jones testified that she mentioned a water loss "in the springs" when she called the Department in 2004. However, Section 5.2 of the Act expressly requires a landowner to report water loss claims to the mine operator. 52 P.S. § 1406.5b. Indeed, Mrs. Jones testified that the Department told her to contact Consol. The date on which Mrs. Jones informed the Department of a water loss in the springs is irrelevant to her duty under Section 5.2. Because the Joneses never notified Consol of a water loss in their springs, Consol cannot be held liable for replacing or restoring that supply.

Notwithstanding these straightforward statutory reporting requirements, the Board held that Consol was liable for the water loss in the Joneses' springs. The Board reasoned that had Consol identified the S1 and S2 springs in its survey, then it would have inferred that they were included in the Joneses' water loss claim when submitted. The question, then, is whether a water loss claim covers all sources of water that were, or should have been, identified on a pre-mining survey, or whether landowners claiming a water loss are required to identify each specific water source that is affected when they submit their claim.

Consol argues that, contrary to the Board's determination, its failure to discover and record the existence of the springs in its pre-mining survey is irrelevant. That survey, it notes, assists the mining company in its defense of a water loss claim; it has every incentive to do a comprehensive survey. Further, nothing in the Act or the Department's regulation requires a mining company to inquire into the status of all water sources on a property when a landowner submits a water loss claim. The only relevant inquiry is whether the Joneses explicitly identified a water loss in the S1 and S2 springs when they

or interruption of a water supply which is believed to have occurred as a result of underground mining activities, the landowner or water user shall notify the opera-

tor. The operator shall diligently investigate the water loss.
25 Pa.Code § 89.146a.

first reported a water loss to Consol in 2004. They did not.

Conversely, the Department argues that Consol bears the burden of developing complete and accurate water records. The Department contends that, in this case, Consol's failure to document properly all water sources on the Joneses' property in its pre-mining survey is the reason why the water loss in the springs was never investigated in the first place. The Department posits that had it been provided with accurate water records, then its investigation, and Consol's, would have included the springs.

Similarly, the Joneses argue that under the Act, all they were required to do was report a water loss. They contend that once a water loss was reported, it became Consol's duty under Section 5.2 of the Act to investigate their claim with diligence, which includes an inquiry into each and every water source on the property, whether previously known or not. Because Consol did not identify all of the water sources on the Joneses' property, it did not do a proper investigation.

The Department's and the Joneses' arguments are contrary to the language of the Act. Section 5.2 provides that a land-owner who experiences "contamination, diminution or interruption of *a water supply*" is required to notify the mine operator. 52 P.S. § 1406.5b(a)(1) (emphasis added). *See also* 25 Pa.Code § 89.146a(a) (repeating requirements of Section 5.2 of the Act nearly verbatim). The use of the phrase "*a* water supply" indicates the General Assembly intended for landowners to identify *each* water source that is experiencing a water loss. A landowner, as the steward of his land, is in the best position to know exactly which water sources are being affected. It is the landowner's duty to relay that knowledge to the mine operator when it makes its claim.[6]

It is not relevant, as the Joneses argue, that Consol did not accurately document all of their water supplies in its pre-mining survey, as required by 25 Pa.Code § 89.145a.[7] The collection of water supply data in pre-mining surveys may be beneficial to both the landowner and mine operator, particularly by facilitating the investigation of water loss complaints. However, the survey is not dispositive of the legal rights and duties of either party. A mine operator is not insulated from liability for a water loss simply because a particular source was developed after a pre-mining

---

6. To hold otherwise would lead to the absurd result of mine operators having to investigate each and every water source on a landowner's property. Depending on the size of the parcel and its location, such an investigation could involve numerous water sources or sources that are located far enough away from any potential mining activities that they could never be affected.

7. In relevant part, it states:
    (a) *Water supply surveys.*
        (1) The operator shall conduct a premining survey ... of the quantity and quality of all water supplies within the permit and adjacent areas.... Premining surveys shall be conducted prior to the time a water supply is susceptible to mining-related effects. Survey information must include the following information to the extent that it can be collected without excessive inconvenience to the landowner:
        (i) The location and type of water supply.
        (ii) The existing and reasonably foreseeable uses of the water supply.
        (iii) The chemical and physical characteristics of the water....
        (iv) The quantity of the water.
        (v) The physical description of the water supply, including the depth and diameter of the well, length of casing and description of the treatment and distribution systems.
        (vi) Hydrogeologic data such as the static water level and yield determination.
    25 Pa.Code § 89.145a (emphasis in original).

survey was conducted. Nor is a landowner required to inform a mining company each time he develops a new water source on his property.

An example illustrates the above points. Consider a mine operator who conducted a thorough pre-mining survey of a landowner's property in January 2010 that showed there were no water supplies on the property. In June 2010, the landowner decides to begin raising cattle and develops a spring to provide the cattle with water. He does not inform the mining company of the new spring. In August 2011, as a result of mining activities, the spring runs dry and the landowner promptly notifies the mine operator of the water loss. If the parties were constrained by the results of the pre-mining survey, the mine operator could not be held liable for replacing the landowner's water supply. This is absurd. Mine operators are responsible for replacing water supplies that have been adversely affected by their mining activities if they have been informed of the water loss within two years of it occurring, even if the water supply in question was not documented prior to mining.

Equally unpersuasive is the Joneses' argument that Consol did not conduct its investigation into the water loss with appropriate diligence. Section 5.2 of the Act requires a mine operator who receives a reported water loss claim to "with reasonable diligence investigate the water loss." 52 P.S. § 1406.5b(a)(1). Section 89.146a(a) of the regulation requires the mine operator to "diligently investigate the water loss." 25 Pa.Code § 89.146a(a). The Joneses assert that Consol's investigation should have uncovered every water source on both parcels, an area of land in excess of 63 acres. We disagree with this construction of "reasonable diligence." Mine operators are required to investigate the water loss, not the water source; the pur-

pose of the investigation is to determine the cause of the loss. To require mine operators to ferret out every existing or potential water source on a landowner's property as the first step in an investigation is beyond reasonable and is perhaps an impossible burden.

In sum, Consol's failure to conduct exhaustive pre-mining surveys cannot form the basis for holding Consol liable for the water loss in the S1 and S2 springs. The Joneses bore the burden under the Act to inform Consol of the loss of water from the springs within two years of the supply being adversely affected. They failed to do so. Therefore, the Board erred in holding that the Joneses' 2004 water loss claim included the depletion of the S1 and S2 springs. Accordingly, we reverse.

### ORDER

AND NOW, this 30th day of June, 2011, the order of the Environmental Hearing Board, in the above-captioned matter, dated June 11, 2010, is REVERSED.